4 F.3d 255
 17 Employee Benefits Cas. 2103
 Robert F. FULLER, Ripley R. Click, Plaintiffs-Appellees,
v.
FMC CORPORATION; FMC Corporation Terminated Vested and
Retired Salaried Employees' Retirement Plan; W. Ronald
Cooper; V.H. Hare; Patrick J. Head; L.P. Holleran; W.J.
Kirby; R.J. Woods; FMC Corporation Severance Pay Plan;
Agri Tech, Incorporated, Defendants-Appellants. (Two Cases)
 Nos. 92-1738, 92-2248.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 1, 1993.
Decided July 28, 1993.
 
 John Charles Thomas, Hunton & Williams, Richmond, VA, argued (Jennings G. Ritter, II, Harry M. Johnson, III, of counsel), for defendants-appellants.
 Stephen Robert Bruce, Washington, DC, argued (John B. Mann, Levit & Mann, Richmond, VA, of counsel), for plaintiffs-appellees.
 Before ERVIN, Chief Judge, NIEMEYER, Circuit Judge, and RESTANI, United States Court of International Trade Judge, sitting by designation.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 FMC Corporation sold a food machinery manufacturing plant in Woodstock, Virginia, to Agri-Tech, Inc., on September 30, 1985, and terminated its employment of the employees working at that facility. In accordance with the agreement between the corporations, Agri-Tech offered employment to all of the employees at the plant and all accepted, continuing work without interruption, but with Agri-Tech as their employer beginning on October 1, 1985.
 
 
 2
 Robert F. Fuller and Ripley R. Click, two long-time sales employees of FMC Corporation who continued employment with Agri-Tech for yet another four years,[1] sued FMC under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1001, et seq., for (1) severance benefits that they claim became payable under FMC's written policy when FMC sold the plant to Agri-Tech; (2) additional retirement benefits that they claim are payable under an early retirement provision of FMC's Salaried Employees Retirement Plan; and (3) a proportionate share of the excess assets of the retirement plan (approximately $726 million) that reverted to FMC after it paid pension liabilities, which they allege is payable by reason of 29 C.F.R. Sec. 2618.30.
 
 
 3
 On cross-motions for summary judgment, the district court[2] entered judgment in favor of Fuller and Click, 796 F.Supp. 909, awarding them severance benefits in the amount of $6,549 and $6,956, respectively; retirement benefits as calculated under FMC's plan for early retirement; and a pro rata share of the $726 million fund that reverted to FMC after it paid plan liabilities. The court also awarded Fuller and Click attorney's fees in the amount of $97,185. This appeal followed. For the reasons that follow, we reverse.
 
 
 4
 * Under the purchase agreement for the Woodstock plant, Agri-Tech agreed:
 
 
 5
 to offer employment to all employees of the Business at comparable levels of compensation, with the same right to later change compensation that FMC has. Buyer will pay all terminated employees for any accrued vacation. FMC will retain all liabilities and obligations for its employees up to the Closing Date under its hourly and salaried pension plans applicable to the Business.
 
 
 6
 The purchase agreement closed on September 30, 1985, and at the end of the day, the employees formally ended work with FMC. The next day the former FMC employees began with Agri-Tech at the same jobs, with the same responsibilities, and at the same salaries. While benefits were similar, Agri-Tech did not have any severance pay arrangement.[3] At the time of the transfer, an FMC representative explained to several employees, including Fuller and Click, that they would not receive severance pay as the result of the sale because they had not been severed. At the time, FMC's written policy for severance pay applicable to employees at the facility read in pertinent part:
 
 
 7
 Laid off employees and terminated employees (employees laid off due to the closing of a plant or location) will receive one weeks pay for each full year of service up to a maximum of twelve (12) weeks pay.
 
 
 8
 Deposition testimony of FMC employees, which remained uncontradicted in the record, established that severance benefits were utilized to minimize the hardship of unemployment and, as a "consistent practice," had not been used to provide additional compensation to employees who accepted other employment arranged by FMC or who continued in their same employment with a successor corporation. Moreover, the benefits were not provided to employees who quit or turned down other employment arranged by FMC.
 
 
 9
 The district court did not find it necessary to construe the language of the severance policy in effect on September 30, but rather concluded as a matter of law that because the "nature of the employment benefits package with the successor company, from an employee[']s point of view, was markedly different from and less favorable than the benefits package with FMC," Fuller and Click should be considered to be terminated employees with a right to severance pay, applying our decision in Livernois v. Warner-Lambert Co., Inc., 723 F.2d 1148 (4th Cir.1983). In reaching its conclusion, the district court held:
 
 
 10
 It is the court's view that where, as here, a selling company has a severance plan and the acquiring company does not, unless the employees who continue with the successor are provided such a plan, then however equal the successor's compensation package is in all other respects, it is not "comparable" as that term was contemplated by the courts in Livernois and Sejman I.
 
 
 11
 Accordingly, the court awarded Fuller and Click benefits under FMC's severance benefit plan.
 
 
 12
 FMC contends that the district court misapplied Livernois and erroneously interpreted the severance pay plan. We agree.
 
 
 13
 In Livernois, the court considered claims for severance pay benefits by former employees of Warner-Lambert, which had sold its Medical-Surgical Division to Professional Medical Products, Inc., (PMP) as a going concern. All the employees of the division were offered employment with PMP at their previous positions at comparable salaries and benefits, with the calculation of benefits, including severance pay, based on the original date of employment with Warner-Lambert. The Warner-Lambert severance pay policy, which the court interpreted under contract principles of South Carolina law, provided that a right to severance pay would arise upon "termination of employment either as a result of job elimination or by reason of Company convenience." 723 F.2d at 1152. The court held that in the circumstances presented, the employees were not terminated by reason of the sale because they continued in employment under substantially the same terms and conditions. But the court concluded that Warner-Lambert could not avoid contractual obligations to pay benefits at some future time when employees were terminated by PMP. The employees' claims for severance pay were therefore not yet ripe.
 
 
 14
 In Sejman v. Warner-Lambert Co., 845 F.2d 66 (4th Cir.1988) (Sejman I ), the Livernois plaintiffs returned to court, alleging that their claims for severance pay had become ripe. Our intervening decision in Holland v. Burlington Industries, 772 F.2d 1140 (4th Cir.1985) (applying ERISA to severance plans), cert. denied sub nom. Slack v. Burlington Industries, 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986) and aff'd sub nom. Brooks v. Burlington Industries, 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986), however, had altered the law under which the case would be considered. ERISA was referred to in Livernois only in passing, and it played no role in the court's decision. In Holland, however, we determined that severance pay plans are within the scope of ERISA and that therefore the federal law of employee benefits controls. 772 F.2d at 1146. Therefore this court remanded Sejman I for evaluation of the plaintiffs' claims under ERISA. 845 F.2d at 70.
 
 
 15
 On remand, the district court entered summary judgment in favor of Warner-Lambert, and in Sejman v. Warner-Lambert Co., 889 F.2d 1346 (4th Cir.1989) (Sejman II ), cert. denied 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990), we affirmed, outlining the ERISA principles governing severance pay plans. We noted that although severance benefits are governed by the terms of the plan adopted by the employer, such a plan is an employee welfare benefit plan whose benefits do not vest, and an employer may amend or eliminate its severance pay plan. Accordingly, an employer selling a plant and terminating the employment of its employees there has no ongoing obligation to pay severance benefits unless such an obligation is provided for under the terms of the then-existing plan. 889 F.2d at 1349. To the extent that Livernois provided, as a matter of South Carolina contract law, an ongoing or vested right of employees in severance pay plans, the decision no longer controls, although its discussion of the termination provisions of the Warner-Lambert plan continues to provide guidance in construing plans containing similar provisions.
 
 
 16
 Against the background of our Livernois/Sejman I/ Sejman II trilogy, we turn to the question of whether Fuller and Click are entitled to benefits under the FMC plan. To prevail, Fuller and Click must show that because of the transfer of the plant from FMC to Agri-Tech they were entitled to severance pay under the terms of the FMC plan in existence at the time; once they became employees of Agri-Tech, FMC had no further obligation to provide severance benefits in respect of later layoffs. Since the FMC severance pay plan did not provide for discretion in determining eligibility for benefits, FMC's decision to deny benefits is reviewed de novo. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989). Our review of the district court's grant of a motion for summary judgment is likewise de novo. See M & M Medical Supplies & Service, Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir.1992) (en banc).
 
 
 17
 The FMC plan provides that severance benefits will be paid to "laid off employees and terminated employees (employees laid off due to the closing of a plant or location)." The policy also defines a lay-off--"a forced reduction in the number of employees for a period of more than three (3) months." Although Fuller and Click's employment with FMC was terminated in the general sense of the word, the controlling definition is provided by the plan--"laid off due to the closing of a plant or location." Thus, for example, while employees who are fired or who quit before the last day services are required are "terminated," no entitlement to severance pay arises because these employees do not meet the definition of the plan. We therefore must consider what the plan means when it provides for benefits upon termination by a layoff due to a plant closing.
 
 
 18
 Fuller and Click contend that since they were no longer working for FMC when FMC sold the plant, they were "terminated ... due to the closing of a plant" and therefore were entitled to severance benefits. FMC argues the contrary, maintaining that the plant was not closed. It argues that the employees' employment and income were not interrupted and therefore the employees did not suffer the hardship which the benefit was designed to mitigate. We find the provision ambiguous and accordingly turn to extrinsic evidence of the plan's meaning.
 
 
 19
 The uncontradicted evidence of prior practice supports the construction of the plan proffered by FMC. FMC employees stated that it was not FMC's policy to pay severance benefits to employees offered continuing employment with a purchaser. As one FMC employee testified, "It's been our consistent practice to pay severance pay only in lack of work or unemployment situations." FMC employees testified that when, in a layoff situation, FMC procured other employment for the employees, severance benefits were not paid. We note that other courts have reviewed FMC's severance pay practices and have similarly found that benefits have not been paid in situations such as this one. See Jung v. FMC Corp., 755 F.2d 708, 713 (9th Cir.1985) (pointing to six other FMC divestitures in which no severance benefits were paid to immediately rehired employees).
 
 
 20
 If we were to award Fuller and Click severance benefits when they suffered no unemployment because of the plant's sale, we would of necessity be changing the consistent FMC practice under the plan of awarding severance benefits only when necessary to mitigate the hardships of unemployment and forcing on the company a new practice of providing a bonus for long service. There is no evidence that the parties intended the plan's ambiguous terms to impose a duty on FMC beyond that duty it consistently recognized. Accordingly, we conclude that because the plant was not closed and Fuller and Click experienced no unemployment or loss of income by reason of the plant's transfer, they were not terminated as that term is defined by the plan. Therefore they are not entitled to severance pay.
 
 II
 
 21
 We next turn to the claims of Fuller and Click for additional retirement benefits under FMC's Salaried Employees' Retirement Plan. The plan provided salaried employees with a regular monthly benefit upon normal retirement and a reduced benefit upon early retirement (retirement between ages 55 and 62). The plan also provided a mechanism for payment of vested benefits to employees who ceased employment with the company before age 55.
 
 
 22
 On November 30, 1985, shortly after FMC sold its Woodstock plant, it terminated this retirement plan. After satisfying those liabilities it thought due, FMC distributed the residual assets of the plan to itself, a sum of approximately $726 million.
 
 
 23
 At the time that the plan was terminated, Fuller was 51 years old and was credited with 19 years service at FMC; Click was 53 years old and was credited with 25 years service. Because neither had attained the age of 55 at the time their employment with FMC ended, FMC refused to pay them an "early retirement benefit." Because their interests in the retirement plan had vested, however, FMC paid them a "termination benefit," which was less than an early retirement benefit. Fuller and Click contend that, based on information provided to them in a summary of the plan, they are entitled, as employees with ten years of service, to elect an early retirement benefit. The plan, however, does not support this contention.
 
 
 24
 The plan calculated normal retirement benefits, payable to employees who retire at 65, based on earnings and years of service. An employee with ten years service could also elect "early retirement," retire after age 55, and receive reduced retirement benefits. The early retirement benefit was the employee's normal retirement benefit reduced by 4% for each year that retirement began before age 62. Finally, the plan provided that if an employee "cease[d] to be an employee before age 55 for any reason other than death," the employee was to receive a "termination benefit" consisting of the normal retirement benefit reduced by 6% for each year that the employee was younger than age 65.
 
 
 25
 FMC determined that, although Fuller and Click had ten years service, because they were not yet 55 when their employment with FMC ended, they were entitled by the terms of the plan to receive only the "termination benefit," based on the 6% reduction, and not the early retirement benefit, based on the more favorable 4% reduction. Fuller and Click were paid the termination benefit by FMC and the district court agreed that the proper interpretation of the plan justifies only that payment. The district court's finding interpreting the language of the plan itself is not contested on appeal.
 
 
 26
 Fuller and Click claim, however, never to have seen a copy of the plan itself. Rather, they were given only a summary plan description (SPD). Under ERISA, employers are required to furnish SPDs which are "written in a manner calculated to be understood by the average plan participant, and ... [are] sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. Sec. 1022(a)(1). Fuller and Click contend that because the description given in the SPD differs from the terms of the plan and purports to give them an option to receive the early retirement benefit using the 4% reduction rate (in lieu of the 6%), they are entitled to the 4% rate. The district court agreed. We must therefore determine whether Fuller and Click are entitled to benefits admittedly not available under the plan but allegedly available under the SPD.
 
 The pertinent provisions of the SPD read:
 Early Retirement
 
 27
 You may at your option, retire on the first day of any month after you attain age 55 with 10 or more years of credited service.... To elect early retirement you must give 60 day advance written notice to the Company. The Personnel Department will give you the necessary forms to complete.
 
 
 28
 * * * * * *
 
 
 29
 If you choose to have your benefit payments begin before you are age 62, the monthly pension amount calculated under the formulas will be reduced 4% for every year ( 1/3 of 1% for each month) that your benefit payments begin before you are age 62.
 
 
 30
 After two pages containing examples illustrating the application of the early retirement benefit, the SPD continues:
 
 If You Leave FMC Before Age 55
 
 31
 If you leave FMC before you reach age 55, you can receive a vested benefit from the Plan if you had at least 10 years of credited service when you terminated. Your benefit is calculated under the terms of the Plan in effect when you terminated employment.
 
 
 32
 Your benefits will begin at age 65 unless you elect otherwise....
 
 
 33
 * * * * * *
 
 
 34
 If you elect to start receiving benefits before age 65, your pension is reduced to account for the longer period of time during which your benefits probably will be paid. The reduction is 6% for each year ( 1/2 of 1% for each month) that your benefit payments begin before you are age 65. There is no reduction if payments begin at age 65.
 
 
 35
 Reading the provisions of the SPD together in a manner that gives all provisions significance, we are left with the conclusion that a person whose employment with FMC was terminated before reaching age 55 would receive only the benefit described under the heading, "If you leave FMC before age 55," with the "early retirement" benefit available only to an employee who retires after reaching age 55. When an employee is terminated from the company's employment before age 55, we think it obvious that, in the absence of provisions stating otherwise, he cannot elect early retirement from that company after age 55. Retirement by definition presupposes an employer-employee relationship. Since Fuller and Click's employment with FMC was terminated before they reached age 55, they could not retire after age 55. See Awbrey v. Pennzoil Co., 961 F.2d 928, 932 (10th Cir.1992).
 
 
 36
 In awarding Fuller and Click additional retirement benefits, the district court stated that the SPD was "drawn in a manner to have led the reasonable participant under the circumstances to expect to receive a 4% reduction upon the election of benefits under the circumstances presented in this case." The court reasoned that the SPD did not make the "clear-cut distinction between employees retiring directly from FMC at the normal or early date and those claiming vested benefits [the termination benefit] even though due to cessation of employment before age 55." The confusion described by the court arose out of the summary's description of the "termination benefit." Recognizing that the language of the underlying plan clearly describes that a termination benefit is applicable when the employee "ceases to be an employee before age 55 for any reason other than death," the district court observed that the SPD simply said "if you leave FMC before you reach age 55." The court concluded:
 
 
 37
 Had FMC truly wished to have its employees know that "If you leave" meant "ceases to be an Employee ... for any reason" it simply could have taken the language directly from the Plan document and copied those words verbatim into the SPDs. FMC did not do that, and it has offered no reason for using different language. The court will not conjure up any on FMC's behalf.
 
 
 38
 While we agree with the district court that the SPD could have made the termination benefit crystal clear by using the same language as that used in the plan itself, if that were the legal requirement, then the purpose of the summary would be frustrated--an SPD required to use the same words as a plan would be nothing different than the plan itself.
 
 
 39
 In any event we find the SPD neither confusing nor ambiguous. It describes two benefits each introduced by a necessary condition. The first benefit, "Early Retirement," is introduced by the condition, "You may at your option, retire on the first day of any month after you attain the age of 55." Several pages later in the SPD another benefit is described to exist "If you leave FMC before age 55." While that benefit is not labeled a "termination benefit," it is certainly not an early retirement benefit since early retirement expressly requires the person's having attained the age of 55. Since both Fuller and Click were under the age of 55 when their employment with FMC ended, by the express and unambiguous terms of the SPD they could only have qualified for the termination benefit with the 6% reduction rate. That benefit has been paid by FMC.
 
 
 40
 Even if the SPD purported to describe benefits not afforded by the plan, Fuller and Click would not be entitled to such benefits in the absence of reliance on the SPD and resulting prejudice. It is true that where the language of the plan and the language of the SPD conflict, we have held that the SPD controls because it is "the statutorily established means of informing participants of the terms of the plan and its benefits." Pierce v. Security Trust Life Ins. Co., 979 F.2d 23, 27 (4th Cir.1992) (internal quotation marks omitted). But a participant may succeed in obtaining benefits based on the language of the SPD only if he can demonstrate reliance on the language of the SPD and prejudice. Id. at 30. In Pierce, twelve retirees alleged that their employer, Security Trust Life Insurance Company, had improperly reduced health care benefits. Although the plan and an amended SPD provided that Security Trust Life could modify benefits, the SPD originally distributed to employees did not. The court found for Security Trust Life, in part because the retirees were not able to show reliance or prejudice. Id.
 
 
 41
 When we apply the same principles to the case before us, it becomes apparent that neither Fuller nor Click could show that he relied on the SPD to his detriment. Rather, they both were separated from FMC by reasons beyond their control, leaving them only with the termination benefit provided by the plan. Thus, even if we were to construe the SPD as Fuller and Click propose, they would receive no greater benefit.
 
 III
 
 42
 In their complaint, Fuller and Click claimed entitlement to a pro rata share of the approximately $726 million in excess assets which FMC recouped when it terminated the Salaried Employee's Retirement Plan. Fuller and Click alleged that by refusing to pay them early retirement benefits, FMC failed to satisfy all liabilities imposed by the plan as required by ERISA, see 29 U.S.C. Sec. 1344(d)(1), and that therefore the excess assets must be distributed to the plan's participants and beneficiaries. FMC responded that Fuller and Click received the benefits to which they were entitled and that, in any event, it had satisfied its obligations by purchasing a group annuity contract from Aetna Life Insurance Company, as permitted by 29 C.F.R. Sec. 2617.21, in which Aetna promised to pay the benefits due under the plan and not paid by FMC. FMC further contended that an initial failure to pay early retirement benefits would not entitle the plan's participants to share in the plan's properly calculated excess assets when the plan, by its terms, has provided for reversion of those assets to FMC. It argued that to hold otherwise would provide to Fuller and Click a windfall not intended by ERISA or by the plan.
 
 
 43
 Having concluded that Fuller and Click were entitled to an early retirement benefit and not just the termination benefit, the district court held that the differential was a "contingent liability" that FMC had failed to satisfy. It also held that this "contingent liability" was not covered by the Aetna annuity contract. It therefore ordered allocation of all the plan's residual assets to its participants or beneficiaries in accordance with 29 C.F.R. Secs. 2618.30 and 2618.32(a).[4]
 
 
 44
 In addition to the grounds stated by the district court, Fuller and Click contend more broadly on appeal, relying on our holding in Tilley v. Mead Corp., 927 F.2d 756 (4th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992), that even if all conditions of early retirement have not been satisfied, "assets that have been contributed in expectation of paying early retirement benefits" must be retained by the plan to cover "contingent obligations" and the failure to retain the contributions violated ERISA. See Appellees Brief at 34-35 (emphasis added).
 
 
 45
 The novel issue now presented is whether residual assets of a retirement plan are to be allocated to plan participants and beneficiaries, rather than to the plan's sponsor as provided by the plan's terms, when the sponsor fails to pay a plan liability.
 
 
 46
 As we have already noted, neither the plan nor the SPD describes an early retirement benefit for employees who have not yet reached the age of 55. Fuller and Click's only interest in the plan at the time of its termination was in a "termination benefit," which concededly has been paid. Their argument that FMC made contributions to the plan "in expectation of paying early retirement benefits" does nothing to answer the question of what benefits they are entitled to under the plan. In addition, it presupposes erroneously that somehow in the future Fuller and Click would be able to satisfy conditions for early retirement. Moreover, their reliance on our decision in Tilley is misplaced. The claimants there had all reached age 55 and had satisfied the conditions precedent for early retirement. The only question that remained was whether the possibility of earning an "unreduced" or subsidized early retirement benefit had been accounted for by the plan. In this case, however, neither Fuller nor Click had reached age 55 at the time the plan was terminated, and, because their employment had been terminated, under no circumstance could they meet the opening condition of an early retirement benefit.
 
 
 47
 For similar reasons, the district court's characterization of the claims of Fuller and Click for early retirement benefits as "contingent liabilities" under ERISA was erroneous. We believe that the court misunderstood that term, which is intended to describe liabilities for accrued and forfeitable plan rights (as compared with accrued and vested rights), and it erred in concluding that in the circumstances here the plan could ever have a liability, contingent or otherwise, to pay Fuller and Click an early retirement benefit.
 
 
 48
 When a single-employer defined benefit plan is terminated, the administrator must pay all liabilities of the plan to participants and their beneficiaries before distributing residual assets to the employer. See 29 U.S.C. Sec. 1344(d). Those liabilities are specifically listed in 29 U.S.C. Sec. 1344(a). Section 1344, however, does not confer benefits on any plan participant or beneficiary. Rather, it provides the order of distribution of plan assets, directing that liabilities for plan benefits first be satisfied before any recoupment by the sponsor can occur. See Mead Corp. v. Tilley, 490 U.S. 714, 722-25, 109 S.Ct. 2156, 2161-63, 104 L.Ed.2d 796 (1989). Thus, to fulfill the duties imposed by Sec. 1344, the administrator must pay all plan liabilities before concluding that excess assets exist which may be returned to the employer.
 
 
 49
 Under the plan in the case before us, because Fuller and Click can never claim an early retirement benefit, to require FMC to hold payments for early retirement benefits in trust for them would amount to the establishment of a perpetual trust without a satisfiable condition for distribution. We therefore believe that the district court erred in concluding that the failure of FMC to pay Fuller and Click an early retirement benefit "contravened any provision of law" entitling the court to consider reallocation of the plan's assets. See 29 U.S.C. Sec. 1344(d); 29 C.F.R. Sec. 2618.30.
 
 
 50
 We also reject the contention of Fuller and Click that the sanction for failure to pay a plan liability is forfeiture by the plan's sponsor of its entire claim for return of the plan's excess assets. As discussed above, ERISA permits residual assets to revert to the employer upon three conditions: (1) provision for reversion in the plan, (2) satisfaction of liabilities, and (3) compliance with law. 29 U.S.C. Sec. 1344(d). In arguing that the penalty for failure to satisfy a liability is the pro rata distribution to plan participants of all excess assets, precluding any reversion, Fuller and Click rely on the regulations at 29 C.F.R. Secs. 2618.30 and 2618.32.
 
 
 51
 Subsection 2618.30(a) provides that residual assets may revert to the employer if the plan so provides and "the distribution does not violate any provision of law." Subsection (b) continues that if the conditions of subsection (a) are not met, the "residual assets shall be allocated among the pool of eligible participants and beneficiaries in accordance with Sec. 2618.32(a)." These regulations thus provide for allocation of residual assets to plan participants and beneficiaries only when the plan does not provide for reversion to the employer or when reversion would violate law. Neither condition is met here. Fuller and Click do not contend that the plan failed to provide for reversion of residual assets nor do they contend that, if liabilities are paid, such reversion would be illegal. Their complaint is that liabilities were not paid. It is a giant leap unsupported by the language of the regulation or legislative intent to conclude that the employer forfeits any right to residual assets upon failing to pay a liability.
 
 
 52
 Moreover, to hold that any failure in satisfying all liabilities would result in a forfeiture would be inconsistent with the equitable principles underlying ERISA and pension administration. The proper sanction for failure to compute correctly or to pay a liability is to require the employer to meet the liability before any assets may revert. See Tilley, 927 F.2d at 763-64 (ordering satisfaction of unmet liabilities before surplus assets could revert). In this case, because we reject the claims of Fuller and Click that FMC improperly refused to pay them an early retirement benefit, no adjustment in liabilities is required.
 
 IV
 
 53
 In summary, we hold that the sale by FMC of its Woodstock plant to Agri-Tech did not cause Fuller and Click to be "terminated" within the meaning of the FMC plan so as to trigger an obligation of FMC to pay severance benefits. In connection with Fuller and Click's claim for early retirement benefits, as provided under the Salaried Employees' Retirement Plan, we hold that by the terms of the plan they were not entitled to elect early retirement because at the time their employment ended they had not reached the required age of 55. FMC therefore properly paid them a "termination benefit" payable to all employees with a vested interest in the plan who leave FMC before age 55, whether voluntarily or not. FMC was not required to pay them early retirement benefits, either under the terms of its termination plan or as a requirement imposed by ERISA. Finally, we hold that ERISA does not provide, as a sanction for failing to pay a liability, that the employer forfeit its claim to all excess assets in the plan to which it otherwise would have been entitled by the terms of the plan.
 
 
 54
 Because of our rulings in favor of FMC, we must also reverse the award in favor of Fuller and Click for attorney's fees.
 
 
 55
 For the reasons given, the judgment of the district court is reversed.
 
 
 56
 REVERSED.
 
 
 
 [1]
 By reason of a business reorganization unrelated to the circumstances in this case, Agri-Tech laid off Fuller and Click on November 1, 1989
 
 
 [2]
 By agreement of the parties the case was decided by a magistrate judge pursuant to 28 U.S.C. Sec. 636(c)
 
 
 [3]
 Fuller and Click have noted that other minor differences in the benefits existed, but we consider them immaterial to our discussion, as did the district court
 
 
 [4]
 Plaintiff's share under the ordered allocation of the Plan's residual assets, which has not been quantified, was to be determined as provided in the district court's June 10, 1992, amendment to its order of May 26, 1992:
 Plaintiffs each shall have and recover against the defendants FMC Corp. and FMC Corp. Terminated Vested and Retired Salaried Employees' Retirement Plan, as an allocation of assets, an amount equal to the difference between a) a percentage of assets existing on termination of the Retirement Plan (November 30, 1985) as determined by the ratio of the present value of each plaintiff's pension benefits based on the 4% reduction factor as awarded above divided by the value of all participants' benefits on November 30, 1985 and b) a percentage of assets existing on termination of the Retirement Plan (November 30, 1985) as determined by the ratio of the present value of each plaintiff's pension benefits based on the 6% reduction factor divided by the value of all participants' benefits on November 30, 1985, together with statutory interest from May 26, 1992.