Pete HICKEY; Timothy O'Leary; Charles H. McKnight; Aaron Adams; Brian Adams; Linda Adams; Tony Adams; Michael Adragna; Keith Dean Aldridge; David Aldridge; Thomas H. Altman; Sarah Anderson; Shirley Arms; Hassie Atkins; Frederick Babb; Vicki Babb; Katherine Renee Bailey; Nurudeen Balogun; John David Barton; Frank Batson; Rodney E. Beeks; Cliff Bloise; Deborah B. Benson; Betty S. Boston; Hugh N. Brock, Jr.; Sheila Brooks; Sharon Brown; Jerry W. Bryant; Carla Buchanen; Camelia M. Buckheister; Donald R. Burton; Dianne Butler; Anita F. Byers; Rosie C. Byrd; Debbie A. Cabe; Linda Campbell; James L. Chastain; Jimmy D. Cisson; Kay R. Clay; Chandra Coker; Patricia Ann Copeland; Patsy Cox; Steven W. Cox; Geraleen Crawford; Gregory Cypert; Jerome Dames; Annette Davis; Anthony Bryan Davis; Gail E. Davis; Michael Davis; Miriam C. Davenport; Robert F. Deal; Shirley Dennis; Laura Dight; William Downs; Dan R. Driver; George A. Durham; Brenda B. Durrance; Toni Eaton; David Ellis; Lucy Fair; Larry M. Faust; William Ferrel; Cheryl Filiberti; Shirley J. Fisher; Edna M. Fowler; Kathie A. Gailey; Jane Gagnon; Linda G. Garner; Carl Gerhiser; Teresa A. Gilliam; Brenda Goldsmith; Rosemary Grant; Jimmy Gray; Wendy B. Gray; Barbara Green; Evelyn Green; Linda Green; Polly Green; Carolyn Griffin; R. Briggs Hamilton; Richard Mark Hanvey; Benny J. Hart; Sandra B. Hatcher; Thomas L. Hendricks; Daniel Holcombe; Gary C. Hooper; Martha Jane Hoover; Wayne H. Horne; Larry Hough; Valerie Houston; Carolyn Howell; Rick Huckaby; James Huff; Gail Hussey; Minnie I. Jackson; Michael G. James; Arthur W. Johns; Janice D. Johnson; Leroy C. Johnson; Shannon S. Johnson; Zonnie Jones; Sandra F. Kelly; Jan Kestner; Satish Kinariwala; Tony King; Keith G. Kitchens; Christopher B. Klugh; Edward R. Knipple; Richard Kurtz; Steve Laforest; Matt Lake; Terry M. Landers; Paulette Lane; Rickey Lanford; Anthony Lark; Damon Lashley; Melanie B. Lay; Lee A. Labarron; Helen C. Lee; Marlene Lee; Ray J. Lee; Yolanda L. Lewis; Cynthia E. Lim; Emmanuel Lim; Brenda Lykes; Alan Madewell; Steven R. Madison; Tony Marable; Glynis D. Martin; Susan Martinez; David R. Massengale; Martha E. Masters; Diane Mattox; Peter J. McCauley; Paula M. McDonald; Barbara S. McDowell; Norma McMurray; Janice Messer; Donna M. Mikulis; Deborah Lynn Miller; Nan Minot; Karl Minton; Lorie J. Mitchell; John Monohan; Tina E.

Moon; A. Bernard Moore; Terri S. Moore; Donald H. Morasco; Lonnie Mote; Zahoor Mukaddam; Rachel E. Mull; Alma R. Murray; James H. Nabors; Jon O'Brien; Tracy O'Brien; Janice O'Neil; Mavis H. O'Shields; Dave Oakley; Debra Ann Oakley; Dennis W. Orren; Clarence Owens; Kathy Owens; Barbara W. Paden; Dale Page; Edna Page; Ann T. Patterson; James D. Pavluk; Ruby M. Perkins; James H. Phillips; Linda J. Phillips; Wilma J. Phillips; Scott Pinion; Ray Plunkett; Marcus L. Poore; Carolyn J. Poteat; Sharon Tracy Powell; Yvonne L. Price; Laurie Pullen; Sheila Rafkah; Cathy J. Reedy; Frank Regina; Richard W. Reid; Virginia E. Reutzel; Jackie Revis; Gregory S. Rhodes; John G. Rhodes; Freida Wyanette Rice; Joseph P. Roach; Marilyn Roach; Jerome Robinson; Sandra Robinson; Nancy Rothel; James E. Rousey; April Sanders; Wallace E. Sanders; Darlene Sawitski; David H. Schartner; Mary Scribner; Jim Seigo; William C. Servies; Daniel R. Simard; Harold J. Simpson; Phyllis C. Simpson; Mary J. Singleton; Ronda Smith; Rick Snyder; Ken Spencer; Dianne Stewart; Mattie W. Stoddard; James Allen Stone; Larry Strickland; C. L. Sullivan; William C. Theemling; Gary W. Theis; Peggy H. Theis; John Theisen; Gwendolyn G. Thomas; Lee E. Thomas; Nancy B. Thompson; Vicki Townsend; Gary Turner; Lisa Turner; Rodney Turner; Sandra O. Van Gieson; David L. Van Gieson; James A. Vaughn; John D. Waddell; Harriet D. Waddell; Marica Denice Waddell; Patsy Walker; Greg Walls; Lee L. Ware; Jammie Watson; Terry L. Wells; David J. White; Diana White; Lucy B. Wilkins; Betty A. Williams; Otis Williams; Patricia Ann Williams; Clementine Williamson; Phyliss Wilmore; Carolyn Wilson; Linda Wilson; Jimmie K. Wright; Jacquline Yeargin; Keran Yeargin; Joseph M. Young; Nancy Blough; David J. Boiter; Michelle Brown; Charles Carle; James S. Daniels; Laura J. Dupree; Bill Earl; John R. Gallaspie; William Giambrone; Gary L. Johnsen; Dan Kestner; Ben F. Lee; Sylvester C. Lee; Wilfred Leon; Bill Line; Tina A. Mayes; Kendra E. McAlister; Richard W. McCall; Shirley McDaniel; Irene C. Meredith; Alma Lucille Moore; Shirley Y. Neely; Steven L. Perkins; Joe Perry; Richard Reifenheiser; David A. Russell; Kurt Stevens; Mike Strajna; Deborah Stroud; Janice C. White; Pamela M. Williams; Vonda Wilson; Martha Woody; Bernice Wright; David L. Wynn; Craig Rush; Karen S. Walters; Carolyn Allen; Harold Durham; Patty Loftis; Angie Bell–Smith; Bobbie Sanders; Inez Griffin, Plaintiffs–Appellants,

v.

DIGITAL EQUIPMENT CORPORATION, Defendant–Appellee.

No. 94–1710.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 1, 1994.

Decided Jan. 12, 1995.

**ARGUED:** John Bowman McLeod, William David Conner, Haynsworth, Marion, McKay & Guerard, Greenville, SC, for appellants. C. David Vaughan, Vaughan & Murphy, Atlanta, GA, for appellee. **ON BRIEF:** L. Grey Geddie, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, SC, for appellee.

Before HALL and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge MICHAEL wrote the opinion, in which Judge HALL and Senior Judge PHILLIPS joined.

## OPINION

MICHAEL, Circuit Judge:

This is a case brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, against Digital Equipment Corporation (Digital) by a large group of its former employees who seek severance pay under Digital's 1991 Severance Pay and Benefits Plan (Plan). In 1992 Digital sold the plant where the employees worked, but the plant's operations were not disrupted by the sale. The employees either retained their same jobs or received severance pay from the buyer which was reimbursed by Digital under the purchase agreement.

The Plan's purpose is to provide severance pay to Digital employees who are terminated in workforce reductions undertaken by Digital. The former Digital employees here argued that they were eligible for benefits under a clause in the Plan which says an "employee of Digital shall be eligible to become a Participant in the Plan if his or her employment with Digital is terminated ... as a result of the closing of a Digital plant...."

Digital's U.S. Employee Benefits Claim Appeal Committee (Committee) denied benefits, and the district court upheld that decision. The central issue is whether the Committee abused its discretion in concluding that, under the facts of this case, there was no "closing" of a Digital plant. Finding no error, we affirm.

## I.

### A.

Digital is an international supplier of networked computer systems, software, and services. In 1988 Digital had approximately 125,000 employees worldwide and, as of that year, had never laid off a single employee. Beginning in 1989, however, bad economic times forced Digital to reduce its workforce, both here and abroad. In connection with its downsizing efforts, Digital adopted the Plan in 1991.

The Plan, which is self-administered, was established "to provide severance pay and other benefits to certain employees described in Article 2 . . . where employment with Digital is terminated as a result of Digital's efforts to streamline its workforce." JA 286. Article 2 provides the criteria for participation in the Plan and says that "a regular employee of Digital shall be eligible to become a Participant in the Plan if his or her employment with Digital is terminated . . . as a result of," among other things, "the closing of a Digital plant. . . ." *Id.* Article 16 gives the plan administrator discretionary authority to interpret the Plan and to determine eligibility for benefits.

Since 1989 Digital has been able to make substantial reductions in its workforce. By the end of fiscal year 1993 Digital had eliminated more than 35,000 jobs worldwide. Digital paid a substantial amount of severance benefits pursuant to the Plan.

### B.

From 1982 through 1992 Digital owned a manufacturing plant in Greenville, South Carolina (GSO Plant), which produced printed wiring boards for use in Digital computers. In 1991, as a part of its worldwide reduction in force, Digital eliminated a number of positions at the GSO Plant and paid terminated employees severance benefits pursuant to the Plan. These employees are not involved in this case.

In late 1991 Digital was approached by AMP–AKZO Corporation (AMP–AKZO), an electronics manufacturer interested in buying the GSO Plant. Digital and AMP–AKZO negotiated an Asset Purchase Agreement (APA), whereby AMP–AKZO would buy the GSO Plant as a going concern and supply Digital with printed wiring boards. Significantly, the APA had several provisions protecting the employees at the plant. First, the APA required AMP–AKZO to offer them employment. Second, it required AMP–AKZO to provide them with compensation and benefits at least equal to what they would have received from Digital. Third, it respected their seniority, requiring AMP–AKZO to credit them for their past service with Digital. Fourth, if AMP–AKZO had to reduce its workforce at the GSO Plant within one year after the purchase date, the APA required Digital to reimburse AMP–AKZO for severance benefits for the first 150 employees laid off, with benefits equal to what they "would have been eligible for under the then current Digital . . . Program." JA 335–36.

Digital's sale of the GSO Plant to AMP–AKZO closed on August 25, 1992. That same day the Digital sign at the plant was replaced by AMP–AKZO's, the employees were informed that they no longer worked for Digital, there was a brief interruption in the operation of the computer system while the system was used to take inventory, and the employees turned in their Digital badges for AMP–AKZO ones. But the plant essentially stayed in continuous operation when the sale occurred, with little or no interruption in production and no interruption in employment. Not a single employee missed any work or pay as a result of the sale. Pursuant to the APA all employees at the GSO Plant were immediately employed by AMP–AKZO at the same facility with the same rate of pay, the same seniority, the same job responsibilities, and virtually the same benefits they had as Digital employees.

Shortly after the sale a number of the former Digital (now AMP-AKZO) employees submitted to Digital management a petition, and subsequently individual letters, complaining about the "terms and conditions regarding our involuntary termination of employment." JA 248. The petition and letters were referred to John Murphy, Digital's Corporate Employee Relations Manager. He denied the claims "because employees had the option to continue their employment with the new successor Company." JA 254. The employees thereafter wrote additional letters to Digital but made no progress. The employees never pursued the administrative remedies set forth in the Plan, which required a claimant to file a written claim with Digital's U.S. Employee Benefits Manager and, if the claim was denied, to seek review with the Committee.

Instead of pursuing the Plan's administrative remedies, a few hundred employees filed an ERISA action against Digital in district court pursuant to 29 U.S.C. § 1132(a)(1)(B). Digital filed a motion to stay or dismiss the action on the ground that the employees had failed to exhaust their administrative remedies. The district court granted the motion and remanded the matter to the Committee. (Although the Plan required that claims first be brought before Digital's benefits manager, the parties agreed to skip this first level of review and proceed directly before the Committee.)

The employees argued to the Committee that they were eligible for participation under Article 2 of the Plan because, they claimed, they were "terminated as a result of the closing of a Digital plant." On February 4, 1994, the Committee issued a nine-page letter denying benefits. The Committee concluded that the employees were not terminated as a result of the closing of a Digital plant because the GSO Plant had not closed when it was sold to AMP-AKZO. The employees returned to district court to seek review of the Committee's decision. On May 5, 1994, the district court entered judgment in favor of Digital, concluding that the Committee's decision "is certainly supported and ... is more than reasonable." JA 134.

The employees appeal, arguing generally that the district court erred in requiring them to exhaust their administrative remedies and in upholding the Committee's denial of benefits.

## II.

We will quickly dispose of appellants' challenge to the district court's order directing them to exhaust their administrative remedies. An ERISA claimant generally is required to exhaust the administrative remedies provided in his or her employee benefit plan before commencing an ERISA action in federal court. *Makar v. Health Care Corp. of Mid-Atlantic (Carefirst)*, 872 F.2d 80, 82 (4th Cir.1989). Here, Article 9 of the Plan required a claimant to file a written claim with Digital's U.S. Employee Benefits Manager, and if the claim was denied, to seek review with the Committee. Appellants did not pursue these channels before filing suit in federal court. Although appellants allege that "the remand [to the Committee] was a mere formality if not a charade," Brief of Appellants at 37, they have not made the "clear and positive" showing of futility required to circumvent the exhaustion requirement. *Makar*, 872 F.2d at 83. Therefore, the district court did not abuse its discretion in directing appellants to exhaust their administrative remedies. We turn now to the heart of this dispute.

## III.

### A.

Before we review the Committee's decision, we must address the standard of review. When a fiduciary is given discretionary powers to determine eligibility for benefits and to construe the language of an ERISA plan, the fiduciary's decision is entitled to deferential review. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Doe v. Group Hospitalization & Medical Servs.*, 3 F.3d 80 (4th Cir.1993); *de Nobel v. Vitro Corp.*, 885 F.2d 1180 (4th Cir.1989). "Thus, where a fiduciary with authorized discretion construes a disputed or doubtful term, we will not disturb the interpretation if it is

reasonable, even if we come to a different conclusion independently." *Doe,* 3 F.3d at 85. *See also de Nobel,* 885 F.2d at 1188 ("where plan fiduciaries have offered a 'reasonable interpretation' of disputed provisions, 'courts may not replace [it] with an interpretation of their own'—and therefore cannot disturb as an 'abuse of discretion' the challenged benefits determination" (quoting *Holland v. Burlington Indus., Inc.,* 772 F.2d 1140, 1149 (4th Cir.1985), *cert. denied sub nom. Slack v. Burlington Indus., Inc.,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562, and *aff'd mem. sub nom. Brooks v. Burlington Indus., Inc.,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986))).

■ There is a caveat, however. In *Firestone* the Supreme Court said that "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' " 489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187 comment d (1959)). In this connection we have held

> that when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

*Doe,* 3 F.3d at 87.

■ Appellants acknowledge that Article 16 of the Plan vests Digital's plan administrator with broad discretion, including the power to interpret the Plan and to decide eligibility for participation, and therefore the Committee's interpretation of the Plan must be reviewed with deference. They argue, however, that the Committee operated under a conflict of interest and that consequently the Committee's decision is entitled to less deference. To demonstrate the potential for bias, they emphasize that the Plan is self-funded by Digital and that the Committee was composed of Digital executives and chaired by Digital's corporate treasurer. Digital emphasizes two points in denying that the Committee operated under any conflict of interest. First, before it began its work, Digital's benefits manager wrote the Committee and, among other things, advised it that it must review appellants' claims "without regard to the financial consequences to [Digital]." JA 141. Second, Digital says it has a good history of paying severance benefits to its former employees.

Although there is no *per se* conflict of interest when fiduciaries have ties to a plan's contributor, *Bidwill v. Garvey,* 943 F.2d 498, 508 (4th Cir.1991), *cert. denied,* 502 U.S. 1099, 112 S.Ct. 1182, 117 L.Ed.2d 425 (1992), we agree with appellants that there was a conflict of interest here because of the financial benefit Digital would receive from a denial of benefits. *See Doe,* 3 F.3d at 86; *Adelson v. GTE Corp.,* 790 F.Supp. 1265, 1270 (D. Md.1992); *compare de Nobel,* 885 F.2d at 1191 (in fully-funded, defined-benefit plan, plan administrator's denial of benefits presented no substantial conflict because any savings benefited the plan, not the company). Our conclusion that there is a conflict is not to say that the Committee would consciously deny benefits to save Digital money. Rather, it is to say that "[e]ven the most careful and sensitive fiduciary ... may unconsciously favor its profit interest over the interests of the plan, leaving beneficiaries less protected than when the trustee acts without self-interest and solely for the benefit of the plan," *Doe,* 3 F.3d at 86–87.

In sum, because the Plan vests the plan administrator with broad discretionary powers, the Committee's interpretation of the Plan is reviewed with deference. However, because the Committee operated under a conflict of interest, we review its interpretation with less deference. Specifically, we review its interpretation "to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the bene-

ficiaries," *id.* at 87.[1] We now take up the Committee's decision.

## B.

■ "The award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Lockhart v. United Mine Workers of America 1974 Pension Trust,* 5 F.3d 74, 78 (4th Cir.1993). "[A]n employer selling a plant and terminating the employment of its employees there has no ongoing obligation to pay severance benefits unless such an obligation is provided for under the terms of the then-existing plan." *Fuller v. FMC Corp.,* 4 F.3d 255, 258 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994). Thus, Digital.had no obligation to pay severance benefits to appellants unless the Plan included such an obligation. The crux of this case involves the meaning of one phrase in the Plan, a phrase which, according to appellants, obligates Digital to pay them severance benefits.

The phrase at issue comes at the end of the provision that a Digital employee "shall be eligible to become a Participant in the Plan if his or her employment with Digital is terminated ... as a result of *the closing of a Digital plant* ...." JA 286 (emphasis added). The Committee concluded that there was no closing of a Digital plant because the GSO Plant had not closed. In reviewing the Committee's interpretation we are guided by several considerations:

> We must give due consideration, for example, to whether the administrators' interpretation is consistent with the goals of the plan; whether it might render some language in the plan documents meaningless or internally inconsistent; whether the challenged interpretation is at odds with

the procedural and substantive requirements of ERISA itself; whether the provisions at issue have been applied consistently; and of course whether the fiduciaries' interpretation is contrary to the clear language of the [p]lan.

*de Nobel,* 885 F.2d at 1188 (internal citations and quotation marks omitted); *see also Lockhart,* 5 F.3d at 77. Appellants seize on two of these factors in urging that the Committee abused its discretion. First, they say the Committee disregarded the clear language of the Plan. Second, they say the Committee's interpretation is inconsistent with the goals of the Plan. We disagree.

Contrary to appellants' assertion, the Committee has not disregarded the clear language of the Plan, because the Plan's language is not clear. Was there really a "closing of a Digital plant"? In appellants' view the sale of the GSO Plant constituted an opening of an AMP–AKZO plant and, contemporaneously, a closing of a Digital plant. Though this is an arguable interpretation of the phrase, it ignores the fact that the GSO Plant never closed. When the plant was sold to AMP–AKZO, it stayed in continuous operation with no interruptions in production or employment. None of the employees missed any work or pay as a result of the sale. They all were employed immediately by AMP–AKZO at the same facility with the same rate of pay, the same seniority, the same job responsibilities, and virtually the same benefits they had as Digital employees.

We thus have two opposite but seemingly tenable interpretations of the phrase "closing of a Digital plant."[2] Nevertheless, the Committee's conclusion that the GSO Plant did not "close" when it was sold is the more reasonable one when the purpose of the Plan is considered.

---

1. Contrary to appellants' assertion, the district court below applied this less deferential standard of review. The court said, "And [*Doe*'s] the standard I'm going to apply to this. But it does ... require at least some deference to the [Committee's] decision." JA 130–31. The court then held that the Committee's interpretation of the Plan was not just reasonable, but "more than reasonable." JA 134.

2. In *Fuller, supra,* we found ambiguous a similar phrase in the context of a plant sale. There, former employees were eligible for benefits if they were "laid off due to the closing of a plant

or location." *Id.* at 259. The employer argued that the plant was not closed, emphasizing that there was no interruption in employment or income when the plant was sold. We concluded that the phrase was ambiguous, and we looked to extrinsic evidence of the Plan's meaning, namely the employer's prior practice of not paying severance benefits to former employees for whom the employer had procured other employment. We ultimately said that the plant had not closed. *See id.* In this case there is no prior practice to consider because prior to the sale of the GSO Plant, Digital had not sold a plant as a going

The Plan says it was established to provide severance benefits to employees who are terminated "as a result of Digital's efforts to streamline its workforce." JA 286. The record here, however, shows that the GSO Plant was not sold to cut jobs, and therefore appellants were not terminated as a result of Digital's efforts to streamline its workforce. For instance, appellants submitted to the Committee an exhibit (a newspaper article from *The Greenville News*) which explained that "Digital sold the plant because it [the plant] produces a commodity product and does not fit Digital's new strategy of concentrating on core businesses such as making equipment that allows computers to communicate through networks...." JA 355. The record elsewhere confirms that the GSO Plant was not sold for force reduction purposes: Digital's U.S. Transition Office was responsible for streamlining Digital's workforce, and it was not involved with the sale of the GSO Plant.

Moreover, Digital presented to the Committee evidence that the Plan was intended primarily for employees who lose their jobs. Because appellants did not lose their jobs when the GSO Plant was sold as a going concern, an award of benefits here would be inconsistent with the Plan's underlying purpose.[3]

To summarize, the Committee's interpretation of the phrase "closing of a Digital plant" is neither contrary to any clear language in the Plan nor inconsistent with the goals of the Plan. Rather, the Committee's interpretation is the more reasonable one when we consider the purpose of the Plan, and it is the more reasonable interpretation despite the fact that the Committee operated under a conflict of interest. Even under our less deferential standard of review, then, we hold that the Committee did not abuse its discretion. That is, the Committee's interpretation "is consistent with an exercise of discretion

by a fiduciary acting free of the interests that conflict with those of the beneficiaries," *Doe,* 3 F.3d at 87.[4]

### C.

We should not end this opinion without noting that the Committee's interpretation avoids a windfall recovery by appellants. Those appellants who remain employed with AMP–AKZO wish to have Digital's severance benefits paid on top of their salaries. Those appellants who have been terminated by AMP–AKZO wish to have Digital's severance benefits on top of AMP–AKZO's severance benefits (which, as noted above, were fully reimbursed by Digital pursuant to the APA). Courts have not looked favorably at such windfall recoveries. *See, e.g., Sejman v. Warner–Lambert Co., Inc.,* 889 F.2d 1346, 1350 (4th Cir.1989), *cert. denied,* 498 U.S. 810, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *Harms v. Cavenham Forest Indus., Inc.,* 984 F.2d 686, 693 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 382, 126 L.Ed.2d 331 (1993); *Bradwell v. GAF Corp.,* 954 F.2d 798, 801 (2d Cir.1992); *Lakey v. Remington Arms Co., Inc.,* 874 F.2d 541, 545 (8th Cir.1989); *Sly v. P.R. Mallory & Co., Inc.,* 712 F.2d 1209, 1211 (7th Cir.1983).

A windfall recovery here would be especially unfair because of the efforts Digital made to protect appellants. Digital adopted the Plan to protect its employees as it struggled through tough economic times. Prior to the AMP–AKZO deal Digital could have done away with severance benefits that had not vested. *See Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 855 (4th Cir.1994); *Fuller,* 4 F.3d at 258. But Digital maintained the Plan, and when AMP–AKZO wanted to buy the GSO Plant, Digital made sure its employees would have minimal disruption in the transition. Digital extracted a written com-

---

concern. Instead, we consider the purpose of the Plan.

**3.** Appellants argue that because Article 5 of the Plan says that benefit payments "shall not be reduced by reason of the Participant securing other employment," JA 292, the Plan's purpose cannot be simply to provide benefits to those who lose their jobs. But appellants place too much faith in Article 5. In *Holland v. Burlington Indus., Inc., supra,* we rejected a similar argument because "[t]his feature of the plan ... could just as easily be attributed to the adminis-

trative convenience of avoiding the need to monitor former employee status...." 772 F.2d at 1149. And, as the Committee here observed, the plain language of Article 5 says benefits will not be reduced if *the Participants* secure other employment; Article 5 says nothing about our case, where *Digital* itself secured reemployment for its employees.

**4.** Having reviewed the record, we reject appellants' assertion that the Committee failed to give them the "full and fair review" required by 29 U.S.C. § 1133(2).

mitment from the buyer (in the APA) that upon the sale of the plant Digital's former employees would retain their jobs, salary, seniority, and benefits. Instead of being laid off, then, the employees were given some measure of security, security that probably was lacking prior to the sale, when Digital was eliminating many positions at the GSO Plant. In short, an award of severance benefits here would be a harsh lesson for Digital—one that could make Digital (and perhaps similarly situated employers) think twice before stepping up to the plate for its employees. *Cf. Sejman*, 889 F.2d at 1349 (noting that an award of severance benefits there "could discourage employers ... from seeking to ensure that their former employees retain their old positions or encourage such employers to forego severance payments altogether").

### IV.

We affirm the judgment of the district court upholding the Committee's denial of benefits.

*AFFIRMED.*