David **KOCAN** and Maryanne C. Kocan, Plaintiffs,

v.

**ABF FREIGHT SYSTEM, INC.,** Arkansas Best Corporation, WorldWay Corporation, and Carolina Freight Carriers Corporation, Defendants.

**Richard E.F. Valitutto and R. Julene Valitutto, Plaintiffs,**

v.

**ABF Freight System, Inc., Arkansas Best Corporation, Worldway Corporation, and Carolina Freight Carriers Corporation, Defendants.**

**Kenneth L. Long, Plaintiff,**

v.

**ABF Freight System, Inc., Arkansas Best Corporation, Worldway Corporation, and Carolina Freight Carriers Corporation, Defendants.**

**Nos. 3:97CV177–P, 3:97CV178–P, 3:97CV335–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

Jan. 15, 1999.

468

Michael Minsker, Charlotte, NC, for plaintiff.

Brian Kaplan, New York City, Maury Josephson, New York City, Debbie Harden, Charlotte, NC, for defendant.

### JUDGMENT

ROBERT D. POTTER, Senior District Judge.

In accordance with the Memorandum of Decision and Order filed simultaneously with this Judgment.

**IT IS ORDERED, ADJUDGED AND DECREED:**

(1) All the claims of the Plaintiffs Valitutto and Long are *DISMISSED* in their entirety *WITH PREJUDICE;*

(2) The Plaintiffs Kocan shall be entitled to receive the vested portion of David Kocan's supplemental retirement benefits, to be paid without acceleration under the terms of Paragraphs 7 and/or 9 of the Senior Executive Benefit Plan provided that Plaintiff David Kocan has adhered to, and will adhere to the limitations on competitive activity as set forth in Paragraph 10 of his Plan. All other claims under the Kocan Plaintiffs' Complaint are *DISMISSED WITH PREJUDICE.*

Each party shall pay their own attorneys' fees and costs.

### *MEMORANDUM OF DECISION AND ORDER*

#### *FINDINGS OF FACT*

A. *The Parties.*

1. Plaintiff David Kocan ("Kocan") is the former Vice President of Labor Rela-

tions of Carolina Freight Carriers Corporation ("CFCC"). Plaintiff Maryanne C. Kocan is Mr. Kocan's spouse and named beneficiary under his Senior Executive Benefit Plan Agreement ("SEBP") signed by Kocan and CFCC on March 13, 1995. See Defendants' Exhibit 8A.[1]

2. Plaintiff Richard E.F. Valitutto ("Valitutto") is the former Vice President and General Counsel of CFCC. Plaintiff R. Julene Valitutto is Mr. Valitutto's spouse and named beneficiary under his SEBP, signed by Valitutto and CFCC on March 13, 1995. See Defendants' Exhibit 8C.

3. Plaintiff Kenneth L. Long ("Long") is the Former Senior Vice President, Northeast Region, of CFCC, who executed the SEBP on December 31, 1994. See Defendants' Exhibit 8B.

4. WorldWay Corporation ("World-Way") was the corporate parent of various companies prominent in the trucking/freight transportation business. WorldWay is the successor in name to Carolina Freight Corporation ("CFC"). CFC changed its name to WorldWay in 1995. Valitutto 11/2/98 Tr. p. 105. ABC Acquisition Corporation ("Arkansas Best") merged with and into WorldWay Corporation, effective October 12, 1995, with WorldWay as the surviving corporate entity. DX3, § 2.1, Cooper 11/3/98 Tr. p. 130. WorldWay was merged completely into Arkansas Best Corporation in 1997, Cooper 11/3/98 Tr. p. 131, with Arkansas Best Corporation being the successor.

5. CFCC, an over-the-road less than truckload ("LTL") motor freight carrier was the largest of WorldWay's subsidiaries and provided the bulk of WorldWay's revenues. CFCC was incorporated in 1937 as a successor to a sole proprietorship operating under the name of Beam Trucking Co. founded by C. Grier Beam in 1932. The company operated as Carolina Freight Carriers Corporation until 1982 when it adopted a holding company structure.

CFCC was a subsidiary to CFC. Huffstetler Tr. 11/2/98 pp. 104–105.

6. In 1995, WorldWay's operating subsidiaries also included without limitation: (a) Cardinal Freight Carriers (a truckload carrier based in North Carolina, with operations extending throughout the Eastern and Southeastern United States, and Canada); (b) Red Arrow Freight Lines (an LTL carrier based in Texas with operations extending throughout the Southwestern United States); (c) GI Trucking (an LTL carrier based in California with operations extending throughout the Western United States, Canada and Mexico); (d) Complete Logistics (which provided logistical support for truckload, metropolitan LTL and warehousing services); (e) Innovative Logistics (which provided transportation-related logistics services, such as intermodal shipping, rate negotiations and freight payment services, truckload and rail brokerage); (f) Carotrans (an international shipping company); and (g) Breakdown Control (Fleet Net).

B. *Plaintiffs' Employment With CFCC and WorldWay*

1. Mr. Kocan joined CFCC in September 1985 as Director of Labor Relations. He subsequently was promoted to Vice President Labor Relations in April 1994. Kocan 11/2/98 Tr. pp. 4, 24–25.

2. Mr. Valitutto joined WorldWay in March 1993 as Assistant General Counsel. He subsequently was promoted to Vice President, General Counsel CFCC in November 1994. Valitutto 11/2/98 Tr. pp. 69–71.

3. Mr. Long joined CFCC in October 1994 as Senior Vice President, Northeast Region. Long 11/2/98 Tr. pp. 49–50.

C. *The Senior Executive Benefit Plan: Background*

CFCC first adopted the SEBP in or about 1980. Since its inception, the SEBP

---

1. Defendants' Exhibits are hereafter designated by "DX" and Plaintiffs' Exhibits are hereafter designated by "PX". For convenience the Court has referred to Defendants' Exhibits which are largely duplicates but numbered differently as Plaintiffs' Exhibits.

has functioned as a collection of Plan Agreements between CFCC and certain of its officers and senior executives chosen to participate in the SEBP. Beginning in 1982, with the adoption of the WorldWay holding company structure, WorldWay administered the SEBP for the holding company and all subsidiaries. Huffstetler 11/2/98 Tr. pp. 112, 113.

D. *Plaintiffs' SEBP Agreements.*

1. The SEBP Agreements of Kocan, Valitutto, and Long provide each senior executive or his beneficiary, as applicable, with four categories of benefits:

(a) A salary continuation death benefit, meaning a twenty year stream of payments due in the event he dies while employed;

(b) A supplemental retirement benefit, with specific vesting requirements as set forth in the Plan Agreement;

(c) A post-retirement death benefit; and

(d) Potential eligibility for "accelerated severance," consisting of the same twenty year payment stream as in (a), payable only in the event his employment was terminated following a change in control, and without the approval of the Incumbent Board (as defined in the Plan Agreement). The history and purposes of the accelerated severance benefit— the principal benefit at issue in this action—is set forth in detail in Section E below.

2. The Plan Agreement also conditions the receipt of any of its benefits upon the participant's refraining from direct or indirect competition with WorldWay or any of its subsidiaries or affiliates, during the period when monthly payments are due thereunder. Paragraph 10 of the SEBP Agreement states:

As conditions to the performance by the Company of its obligations under this Agreement, the Employee agrees that during his employment with Company, and for the further period during which monthly installments are payable hereunder, Employee will not, without the prior consent of the Board of Directors of the Company, directly or indirectly render any services to, become employed or otherwise participate or engage in the financing or conduct of any business which competes with any business conducted by the Company, the Corporation, or another subsidiary of the Corporation (the "Controlled Group") in an area where such business is being conducted by a member of the Controlled Group.... Any provision of this Agreement to the contrary notwithstanding, no benefit whatsoever shall be payable under this Agreement if Employee fails to comply with the conditions of this paragraph 10. See DX 8A, 8B, 8C.

E. *History and Purposes of the Accelerated Severance Benefit*

1. Under the terms of the Plan Agreement, accelerated severance, if due, would be provided in the same form as the stream of partial salary continuation payments that would be made pursuant to the Plan Agreement upon death while employed. DX 8A, 8B, 8C.

2. The initial version of the Plan Agreements, used from 1980 to early 1988, has an accelerated severance provision different from the one at issue in this case. Those pre–1988 agreements provided:

Nothing in this Agreement shall be construed to obligate the Company to continue to employ Employee; provided, however, that in the event such employment relationship is terminated within twenty (20) years of the date of this Agreement by Company or any successor corporation at any time after there has been a change in the working control of the Company or any successor corporation, and such termination occurs without the approval of the then living members of the Board of Directors of the Company as that Board was composed on (the date of the Agreement),

Company or its successor corporation, as the case may be is required to pay the accelerated severance benefit. See DX 34, ¶ 11 at 5.

Note that approval was required by "then living members of the Board of Directors". See DX 34. Unlike Kocan's, Valitutto's or Long's Plan Agreements, the pre–1988 Plan Agreement contained this restrictive language.

3. A number of developments led WorldWay's Board to seek review of the SEBP and a redrafting of the triggering mechanism for accelerated severance. Between 1986 and 1988, board members became aware of various hostile takeover activity in the trucking industry generally and rumors concerning WorldWay specifically. See Huffstetler 11/2/98 Tr. pp. 121–127.

4. Against this background, the Board authorized an effort which came to be known as Project Early, the purpose of which was to place the Company in its best posture to deal with an unsolicited takeover attempt and maximize shareholder value. In conjunction with Project Early, WorldWay retained the services of the law firm Sullivan and Cromwell and the investment banks Morgan Stanley; and Donaldson, Lufkin, and Jenrette. See Huffstetler 11/2/98 Tr. pp. 121–123; DX 21 at 2; Yorke 11/3/98 Tr. p. 32.

5. Recommendations made to the Board during this time included amending WorldWay's Articles of Incorporation to provide that directors could only be removed from the Board "for cause" and evaluating and amending WorldWay's benefit plans, including the Senior Executive Benefit Plan, to contain "shark repellent" wherever possible. The Board directed Palmer Huffstetler, then WorldWay's general counsel, to take appropriate action to implement these recommendations. Huffstetler 11/2/98 Tr. pp. 122–126; Richardson 11/3/98 Tr. p. 193.

6. Another factor leading to amendment of the Plan Agreements in or about 1988 was Mr. Huffstetler's observation, following the deaths of several directors, that the accelerated severance provision contained in the initial Plan Agreements did not sufficiently address changes in the Board's composition due to deaths, resignations, retirements, and the like. Huffstetler 11/2/98 Tr. pp. 117–118.

7. Drawing on Project Early documents prepared by Sullivan and Cromwell, Mr. Huffstetler altered the change in control language of paragraphs 9(b) and 9(c) of the 1988 version of the Plan Agreement at issue here.

8. Paragraph 9(b) of the 1988 SEBP Agreement states:

Nothing in this Agreement shall be construed to obligate the Company to continue to employ Employee; provided, however, that in the event such employment relationship is terminated by the Company or any successor corporation at any time after a change in control of the Company or any successor corporation, and such termination occurs without the written approval of a majority of the Incumbent Board as defined in paragraph 9(c)(2) either before or after such termination occurs, the Company ...

is required to pay the accelerated severance benefit. See DX 8A, 8B. (Emphasis added).

9. In contrast with the fixed group of individuals who would have had to approve all executive's termination following a change in control under the pre–1988 Plan Agreement, the Plan Agreements at issue here contain an evolving Incumbent Board mechanism under which individuals who were elected as members of the WorldWay Board would, by definition, become members of the Incumbent Board if their elections were approved by three-quarters of their predecessors. See DX 8A, 8B.

10. Incumbent Board definition under paragraph 9(c)(2) is "individuals who constitute the Board on the date hereof (1) ..." Paragraph 9(c)(2) then continues with the proviso:

... provided that any person becoming a director subsequent to the date hereof whose election or nomination for election by the Corporate's [i.e., WorldWay's] shareholders, was approved by a vote of at least three quarters of the directors comprising the Incumbent Board (either by specific vote or by approval of the proxy statement of the Corporation [i.e., WorldWay] in which such person is named as a nominee for director, without objection to such nomination) shall be, for purposes of this clause (c), considered as though such person were a member of the Incumbent Board.

DX 8A, 8B.

11. Consistent with the redrafting of the Plan Agreement's triggering mechanism for accelerated severance in conjunction with Project Early, Paragraph 9(c)(2) draws a distinction between a Board elected through a negotiated transaction versus a Board elected through hostile means such as a proxy fight, unsolicited tender offer, or both. In the negotiated context, if the pre-transaction Board votes to approve the election of new directors once the transaction is complete, those new directors will automatically replace the old directors as the new Incumbent Board. As a result, if a majority of the Board were imposed in such hostile fashion, then an SEBP participant terminated following a change in control would be eligible for an award of accelerated severance.

12. During the 1987 and 1988 Board meetings, the WorldWay Directors reviewed and approved two employee benefit agreements with markedly different results in the event of a change in control. The two agreements were the Plan Agreements at issue in this litigation and the "2.99 Severance Pay Plan." In contrast with the SEBP Agreements of Kocan, Valitutto, and Long, which leave an award of severance benefits following a change in control to the discretion of the Incumbent Board, the 2.99 Severance Pay Plans left no discretion. Under these 2.99 Severance Pay Plans, which were approved only for a select few in the highest echelon of management, severance would automatically be paid to the individual upon termination within a specified period after a change in control. The only exception to payment of severance with the 2.99 Severance Pay Plans was if the employee's termination was for cause or because of death, retirement or disability. Huffstetler 11/2/98 Tr., pp. 169–172; DX 10.

13. These 2.99 Severance Pay Plans provided:

> If any of the events described in Section 3 hereof constituting a change in control of the Company shall have occurred, you shall be entitled to [specified severance benefits] upon the termination of your employment within twenty-four (24) months after such event, unless such termination is (a) because of your death or Retirement; (b) by the Company for Cause or Disability; or (c) by you other than for Good Reason .... (DX 10 at 3).

14. Additional evidence of the Board's intention not to trigger accelerated severance to Plaintiffs in the instant action can be found in the WorldWay Director Fee Continuation Plan. Like the SEBP, the Director Fee Continuation Plan took the form of individual agreements ("Fee Continuation Agreements") between WorldWay and each member of its Board of Directors, and provided generally for supplemental retirement benefits in the event a Director served for a certain number of years and a death benefit in the form of fee continuation for 15 years in the event a Director were to die in service. (See DX 9). Cooper 11/4/98 Tr. p. 5, lines 18–25; p. 6.

15. Parallel with the redrafting of the Plan Agreements in 1988, the Board authorized Mr. Huffstetler to redraft the Fee Continuation Agreement to contain the same language as was added to Paragraph 9 of the SEBP Agreement, including the identical definition of the term "Incumbent Board." See DX 29 (Bates Stamp DL 2079).

16. Thus, Paragraph 6 of the Fee Continuation Agreement states:

> In the event the term of service of the Director is terminated by the Company or any successor corporation at any time after a change in control of the Company or any successor corporation, and such termination occurs without the written approval of a majority of the Incumbent Board, as defined herein, either before or after such termination occurs, the Company . . .

shall pay an accelerated change in control payment.

17. Paragraph 6 of the Fee Continuation Agreement defines the Incumbent Board as:

> . . . individuals who constitute the Board on the date hereof (the "Incumbent Board") . . . provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least three-quarters of the directors comprising the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as nominee for director, without objection to such nomination) shall be, for purposes of this paragraph considered as though such person were a member of the Incumbent Board. DX 9 and DX 29, and attached Restated Fee Continuation Plan.

18. Following the transaction with Arkansas Best, the departing Pre–Merger WorldWay Directors did not receive any change in control payments pursuant to the language quoted above. Rather, each Director who was vested in the retirement portion of his Fee Continuation Agreement as of August 1995 became entitled to receive only such vested retirement benefits.

19. Mr. Richard F. Cooper, General Counsel for Arkansas Best Corporation, summed up for the Court in very cogent and concise language the distinction between the SEBP (which is the subject of this dispute) and Director Fee Continuation Agreements, the Stock Option Agreements, and the 2.99 Severance Agreements. This testimony is found in the transcript of his testimony on November 4, 1998 commencing at P. 3, line 23 and continuing to p. 8, line 1. The Court feels that testimony is of sufficient importance to be set out in this memorandum as follows:

A. At that time, I reviewed, oh, a number of documents of all sorts, but among those, I looked at the Senior Executive Benefit Agreements, I looked at the Director Fee Continuation Agreements, the stock option agreements and the severance agreements, the 2.99 as we've been calling them agreements, among other documents that I looked at.

Q. Mr. Cooper, did you take the Senior Executive Benefit Plan and the provisions of Paragraph 9 into account in the drafting of the agreement and the plan merger?

A. Absolutely. When going through the documents, particularly those four I just mentioned, it was very obvious that two of them were—all four of them had change in control provisions in them. Two of them, the 2.99 agreement, the severance agreement, and the stock option, those agreements did not have an incumbent board concept in them. It was clear that almost under any circumstances, once we had a change in control, once we had purchased more than 30 percent of the stock of WorldWay, that there was going to be a change in control, and those documents there would be an acceleration of payment on.

The other two documents, those being the Senior Executive Benefit Agreement and the Director Fee Continuation Agreements, they both contained the incumbent board provision that we've been talking about here for the last several days. And in looking at, you know, that was the standard type provision that allowed, if you went to the board of the company you were trying to acquire and went through them, then they could

deactivate the change in control provision, the acceleration, by effectively blessing the deal, and therefore, you wouldn't have to pay any of the penalty and acceleration. You would have to pay what was owed otherwise under those agreements.

So, yes, I was very aware of that, and in fact, that's the, among other things the structure of the agreement does, the plan of merger, the actual agreement we entered into with WorldWay to purchase the shares, it addresses that, particularly in section 1.5, where it says that upon receiving the appropriate number of shares, that ABC will be able to designate a corresponding number of directors on the WorldWay board.

Q. So it's clear, Mr. Cooper, did Arkansas Best pay the change in control benefits under 2.99 or severance pay agreements, the—referred to by some people as the 2.99 and others as severance agreements?

A. Yes, there were four of those agreements, the 2.99's, and yes, we did wind up paying those; change of control was triggered, and we did. We also paid for accelerated vesting in stock options because, again, it did not have an incumbent board concept in it.

Q. When you paid—you did not pay the benefits under Paragraph 9 under the Senior Executive Benefit Plan?

A. We paid no acceleration agreement benefits under either the Senior Executive Benefit Agreement or the Director Fee Continuation Agreements.

Q. Because those contained the same language?

A. That's correct, they had the incumbent board language in them.

Q. Now, Mr. Cooper, has title company paid any benefits under the Senior Executive Benefit Plan?

A. Yes, there were a number of benefits being paid to people who had already started drawing their senior benefits before our takeover and before our purchase of WorldWay, and we continued to pay all of those. And since then, since our purchase, one individual, Don Shaw, who is one of Mr. Minsker's plaintiffs in another case, I think we started paying him, I think a year or two ago under the terms, under the nonaccelerated terms of the Senior Executive Benefit Agreement.

Q. Are the payments that you have been making under the Senior Executive Benefit Plan the supplemental retirement payments that were vested to certain individuals?

A. That's correct—well, to Mr. Shaw, the people who were paying who began drawing before we took over, it might be from death or from supplemental retirement, but according to the terms of the agreement.

Q. Mr. Cooper, I know you sat through this trial. Do you recall that several of the plaintiffs, Mr. Valitutto, Mr. Kocan and Mr. Long testified that they worked diligently after the announcement of the tender offer, do you recall that testimony?

A. Yes, I recall their testimony.

Q. Did Arkansas Best compensate the officers in any way who remained with WorldWay after the tender offer and worked during title transition period?

A. Absolutely. First of all, they continued to receive all of their benefits, their salaries, there was nothing cut back. And then for those people who were terminated after—in late September, October, if they had stayed until as long as we requested them to, they were paid six months' severance pay.

Q. And so there is no confusion, Mr. Cooper, each of the plaintiffs in this case, Mr. Kocan, Mr. Long and Mr. Valitutto, have received six months of severance pay, is that correct?

A. That's correct.

Cooper 11/4/98 Tr. p. 3, lines 23–25; pp. 4—7; p. 8, line 1.

F. *WorldWay's Decline and the Arkansas Best Transaction.*

1. CFCC generally prospered from the time of its founding until the early 1990's. CFCC's prosperity largely coincided with a period of intense federal regulation of the trucking industry, under the jurisdiction of the Interstate Commerce Commission ("ICC"). Richardson 11/3/98 Tr. pp. 188–189; Younger 11/3/98 Tr. p. 154.

2. Passage of amendments to the Motor Carrier Act in 1980, however, ushered in a period of deregulation and increasingly intense competition in trucking, and particularly harsh impact on relatively smaller LTL carriers like CFCC. Since CFCC provided the bulk of WorldWay's revenues, WorldWay's fortunes soured in the early 1990's and never recovered. Richardson 11/3/98 Tr. pp. 189–190.

3. WorldWay's Board of Directors began aggressive steps to address the decline of WorldWay's business in 1993 by, among other things, hiring Lary R. Scott as WorldWay's Chief Executive Officer. Mr. Scott formerly had been the Chairman of Consolidated Freightways, Inc., holding company for one of the country's largest over-the-road air and intermodal shipping networks. Richardson 11/3/98 Tr. pp. 205–206; Younger 11/3/98 Tr. pp. 164–165.

4. The WorldWay Board provided Mr. Scott with two explicit charges, to be pursued simultaneously; (i) to bring about a turnaround of WorldWay's business; and (ii) to seek out a friendly merger or other strategic combination between WorldWay and another trucking firm. Younger 11/3/98 Tr. p. 165.

5. In April 1994 the International Brotherhood of Teamsters commenced a nationwide strike against the LTL industry. WorldWay's LTL subsidiaries (CFC and Red Arrow), financially unable to weather the strike, sought and obtained rare exemption from the Teamsters. Younger 11/3/98 Tr. pp. 166–167; Kocan 11/2/98 Tr. pp. 14, 15.

6. Despite being able to operate through the strike, WorldWay's LTL subsidiaries lost approximately $4.8 million in 1994. WorldWay's LTL subsidiaries had also lost 7.5 million in 1993. Had CFCC and Red Arrow been struck, they would have faced the prospect of bankruptcy and liquidation within two or three days. The strike lasted 24 days. Richardson 11/3/98 Tr. p. 211; Younger 11/3/98 Tr. p. 167; Kocan 11/2/98 Tr. p. 15; DX 4 at 4.

7. In connection with the charge to find a friendly buyer, WorldWay began discussing a potential merger with Arkansas Best early in 1994. After a hiatus due in part to the Teamsters' strike described above, the discussions resumed in 1995. Younger 11/3/98 Tr. pp. 166–169; DX 4 at 4.

8. By the time the discussions resumed in 1995, WorldWay stood on the precipice of bankruptcy and liquidation. For the second quarter of 1995, WorldWay had stated pre-tax losses of $18 million, projected at $11.4 million after taxes. Additional losses of $1.1 to $1.3 million per week were projected for the remainder of 1995, as well as weekly cash losses of $500,000 to $700,000. WorldWay's credit facility with Citibank stood within weeks of expiration and would not be renewed and alternative credit was available only on considerably less favorable terms. DX 1 at 2; Richardson 11/3/98 Tr. pp. 211–212.

9. The resumed discussions between WorldWay and Arkansas Best ultimately produced an agreement for Arkansas Best's purchase of WorldWay for $11.00 per share. Richardson 11/3/98 Tr. p. 212; DX 1. Despite WorldWay's dire financial conditions, this price represented a premium of nearly 16% over WorldWay's per share trading price at the time. Needless to say, the WorldWay Board was elated by the offer, and voted unanimously to recommend it to the shareholders. Richardson 11/3/98 Tr. pp. 211–213; Younger 11/3/98 Tr. p. 171.

10. Prior to voting, the WorldWay Board reviewed a variety of subjects at their July 8, 1995 meeting, including

WorldWay's deteriorating finances and the lack of interest in an acquisition by potential acquirers other than Arkansas Best. Liquidation analyses were presented at the meeting by both WorldWay's chief financial officer and outside investment bankers. DX 1. WorldWay's project share price in liquidation, from a low of $3.40 to a most likely scenario of approximately $8.00, was far inferior to Arkansas Best's $11.00 cash offer. Younger 11/3/98 Tr. p. 171; DX 1 at 3.

11. Pursuant to an Agreement and Plan of Merger (the "Merger Agreement"), was unanimously approved by the WorldWay Board at a meeting on July 8, 1995, Arkansas Best commenced a tender offer for WorldWay's common stock on July 14, 1995.[2] Richardson 11/3/98 Tr. pp. 212–213; Yorke 11/3/98 Tr. p. 88; DX 2. The tender offer was extremely well received, and closed on August 11, 1995, with 91% of WorldWay's shares (approximately 5.9 million to 6.5 million), having been tendered to Arkansas Best for payment. Immediately after the close of the tender, Arkansas Best began the process of integrating its and its operating subsidiaries' business with those of WorldWay (including CFCC). Yorke 11/3/98 Tr. pp. 89–90; Cooper 11/3/98 Tr. pp. 117, 122; DX 6.

G. *The Corporate Processes of Arkansas Best's Acquisition of WorldWay Relevant to Plaintiffs' Plan Agreements.*

1. At the July 8, 1995 meeting, the Pre–Merger Directors reviewed and then voted unanimously to approve the Merger Agreement, to recommend that WorldWay's shareholders accept Arkansas Best's $11.00 per share tender offer and to authorize Scott and Yorke (WorldWay's General Counsel) to take steps "necessary or appropriate" to carry out the terms of the Merger Agreement and the transactions contemplated thereby. DX 1.

2. Article I, Section 1.5(a) of the Merger Agreement (DX 3) specifically addressed the evolution of WorldWay's Board upon consummation of the Arkansas Best tender offer, assuming a tender of greater than 50% Arkansas Best would designate a number of directors for election to the WorldWay Board proportionate to its holding of WorldWay common stock (the "Arkansas Best Designees"), and sufficient number of Pre–Merger Directors would resign to make way for the Arkansas Best Designees' election. Article I, Sections 1.5(a) and (b) was as follows:

Section 1.5 Directors.

(a) Promptly upon the acceptance for payment of any shares of Company Common Stock by Sub (ABC Acquisition Corp.) pursuant to the Offer, Sub shall be entitled to designate such number of directors, rounded up to the next whole number, on the Board of Directors of the Company as will give Sub, subject to compliance with Section 14(f) of the Exchange Act, representation on the Board of Directors equal to at least that number of directors that equals the product of the total number of directors on such Board (giving effect to the directors elected pursuant to this sentence) multiplied by the percentage that the aggregate number of shares of Company Common Stock held by Sub, including shares of Company Common Stock then outstanding, and the Company and its Board of Directors shall, at such time, take any and all such action *needed to cause Sub's designees to be appointed to the company's board of directors (including to cause directors to resign ).*

(b) *The company's obligations to appoint designees to the Board shall be subject to Section 14(f) of the Ex-*

**2.** The corporate entity formed for the purpose of carrying out the tender offer was ABC Acquisition Corporation ("ABC Acquisition"), a North Carolina corporation and wholly-owned subsidiary of Arkansas Best. For ease of reference, ABC Acquisition will also be referred to as Arkansas Best.

*change Act and Rule 14(f) and Rule 14(f)1 in order to fulfill its obligations under this Section 1.5 and shall include the Schedule 14D–9 mailed to shareholders promptly after the commencement of the Offer such information with respect to the Company and its officers and directors as is required under Section 14(f) and Rule 14(f)(1) to fulfill its obligations under this Section.*

(Emphasis added).

3. The Pre–Merger Directors were informed who their potential replacements would be and the process by which they would be elected to the WorldWay Board following the close of the tender offer. Richardson 11/3/98 Tr. at 213; Younger 11/3/98 Tr. at 173; DX 5 at 38–39.

4. On July 14, 1995, the WorldWay Board of Directors mailed to shareholders the following items: (a) WorldWay's Solicitation/Recommendation Statement on Schedule 14D–9; (b) Arkansas Best's Offer to Purchase; and (c) a cover letter to shareholders from Mr. Scott (on behalf of the Board of Directors). DX 4.

5. Those documents informed WorldWay's shareholders of the process by which the Arkansas Best Designees would be elected to the WorldWay Board, the identities of, and biographical information concerning the ten candidates for election to the WorldWay Board. DX 5 at 38–39.

6. By unanimously approving the Merger Agreement and the transactions contemplated thereby, and unanimously directing Messrs. Scott and Yorke to take such action as "necessary or appropriate" to carry out those transactions, the Pre–Merger Directors unanimously approved the election of the Arkansas Best Designees to the WorldWay Board by specific vote on July 8, 1995. See DX 1 and attachments.

7. Arkansas Best's tender offer closed at midnight on August 10, 1995, with approximately 91% of shares having been tendered.

8. Pursuant to Section 1.5(a) of the Merger Agreement, Arkansas Best became, based on the 91% tender, entitled to designate for election the holders of seven of eight seats on WorldWay's Board. Arkansas Best designated Messrs. Young, Neal, Cooper, Meyers, Slack, Marquardt, and Morris. Yorke 11/3/98 Tr. pp. 89–90; Cooper 11/3/98 Tr. pp. 117, 122; DX 6.

9. On August 11, 1995 Messrs. Boggan, Carstarphen, Grace, Mapel, Martin, Richardson, and Younger resigned from the Board to make way for the Arkansas Best Designees' election. Upon these resignations, Lary Scott became the sole director of WorldWay remaining in office. DX 6 and attachments.

10. In furtherance of the Merger Agreement, on August 11, 1995, Messrs. Young, Neal, Cooper, Meyers, Slack, Marquardt and Morris were elected to fill the vacancies created by the voluntary resignations of Messrs. Boggan, Carstarphen, Grace, Mapel, Martin, Richardson, and Younger. Such election was approved by a unanimous vote of the Incumbent Board as it existed in July (i.e., the Pre–Merger Directors) and was carried out by Mr. Scott, acting pursuant to his prior directive from the WorldWay Board to implement the Merger Agreement and as the sole remaining director remaining in office. See DX 6.

11. Article III, Section 5 of WorldWay's By–Laws provide, in relevant part:

> Any vacancy occurring in the Board of Directors ... may be filled by the Board of Directors. If the directors remaining in office do not constitute a quorum, the directors may fill the vacancy by the affirmative vote of a majority of all the directors, or by the sole remaining director, remaining in office.... A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. (Emphasis added) (See DX 6; DX 18).

12. This Board thus became the Incumbent Board under Paragraph 9(c)(2) of the Plan Agreement and the By–Laws of WorldWay.

13. The WorldWay Board consisting of Messrs. Scott, Young, Neal, Cooper, Mey-

ers, Slack, Marquardt, and Morris, operating as the Incumbent Board, executed a resolution on October 17, 1995 approving the terminations of Messrs. Kocan, Valitutto, and Long (and other senior executives) for purposes of the SEBP. (See DX 7) Exhibit A..

14. In contrast, those officers having 2.99 Severance Pay Plans as described above change in control severance benefits under their agreements. They received such benefits because their agreements did not make payment of severance contingent upon non-approval of the termination of their employment by the Incumbent Board. Cooper 11/4/98 Tr. pp. 5–7.

15. Since their termination of employment from CFCC, Messrs. Kocan and Long have provided—and are currently providing—transportation services to motor freight carriers in the trucking industry. Kocan 11/2/98 Tr. pp. 34–38; DX 82 (describing Kocan's employment with D & B Logistics); Long 11/2/98 Tr. pp. 61–62 (describing Long's employment with SET Transportation and Timeway Corp.).

16. Plaintiff Long commenced employment with CFCC in October of 1994 (Long 11/2/98 Tr. p. 49) and was terminated September 23rd or 24th, 1995. (Long 11/2/98 Tr. p. 60). He started a logistics and transportation service on January 1, 1997. (Long 11/2/98 Tr. p. 61) See PX 1–C and 3–C.

17. Plaintiff Kocan commenced employment with CFCC on September 23, 1985. Kocan 11/2/98 Tr. pp. 3–4. Kocan commenced employment with D & B Logistics in December 1995. Kocan 11/2/98 Tr. pp. 36–37. Kocan also managed the Allied Signal business for Landstar Logistics at some time since his termination by CFCC. He was terminated by CFCC (WorldWay) on October 17, 1995. DX 7, Attachment A.

18. Plaintiff Valitutto commenced employment with CFCC in November, 1994. Valitutto 11/2/98 Tr. p. 69. He was terminated by CFCC October 17, 1995. DX 7, Attachment A.

## CONCLUSIONS OF LAW

1. ERISA plans are interpreted with reference to the federal common law of contracts. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). The first touchstone of such interpretation is the written plan's express terms. As the Fourth Circuit Court of Appeals has observed, "[t]he award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Hickey v. Digital Equip. Corp.,* 43 F.3d 941, 947 (4th Cir.1995) (quoting *Lockhart v. United Mine Workers 1974 Pension Trust,* 5 F.3d 74, 78 (4th Cir.1993)). Language in contract is ambiguous when it is reasonably capable of being understood in more than one sense. Test for determining whether a contract is ambiguous is whether reasonable persons would find the contract subject to more than one interpretation. Black's Law Dictionary. 6th Ed.1990 (citations omitted). The Court finds that the language in the SEBP is not ambiguous. It means what it says, and says what it means.

2. Where, as here, the plan language at issue is unambiguous on its face, it controls, and the Court need not examine evidence extrinsic to the plan. *See Baker v. BASF Corp.,* 83 F.3d 414, No. 95–1353, 1996 WL 192076 at *2 (4th Cir. Apr.22, 1996); *Denzler v. Questech, Inc.,* 80 F.3d 97, 101, 103 (4th Cir.1996); *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir.1993). If the Court believes that any of the relevant provisions of the plan are ambiguous, it may look to extrinsic as an aid to interpretation. *See Fuller v. FMC Corp.,* 4 F.3d 255, 259 (4th Cir.1993), *cert. denied,* 510 U.S. 1115, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994).

3. The circumstances under which Plaintiffs may be eligible for the accelerated severance benefit are set forth in Paragraphs 9(b) and 9(c) of their Plan Agreements.

4. Paragraph 9(b) sets forth three conditions that each senior executive must

satisfy in order to be eligible for accelerated severance: (a) there must be a change in control of WorldWay; (b) his employment must be terminated by the Company (or any successor corporation) after the change in control; and (c) his termination must be without the written approval of WorldWay's Incumbent Board, as defined in Paragraph 9(c)(2) of the Plan Agreement, either before or after such termination occurs.

5. Defendants acknowledge that a change in control of WorldWay had occurred by August 10, 1995 when 91% of the outstanding common stock shares of WorldWay had been tendered to Arkansas Best by WorldWay's shareholders. Similarly, the record shows that Messrs. Kocan, Valitutto, and Long were involuntarily terminated.

6. The Incumbent Board of Directors of WorldWay unanimously approved the termination of Kocan, Valitutto, and Long in writing on October 17, 1995. Thus, the third condition for payment of accelerated benefits as provided for in Paragraph 9(b) of the Plan Agreement was not satisfied.

7. On October 17, 1995, WorldWay's Board of Directors consisted of Lary Scott, Richard Cooper, William Marquardt, John Meyers, John Morris, Donald Neal, R. David Slack, and Robert Young, III. These individuals constituted the Incumbent Board under Paragraph 9(c)(2) of the Plan Agreement.

8. Long and Valitutto are not eligible anyway for any supplemental retirement benefits under their respective Plan Agreements because each had less than five years of service, which corresponds to 0% of the benefits according to the vesting schedule in Paragraph 5 of the Plan Agreement. DX 8B and 8C.

9. The *Kocan* Plaintiffs would be eligible to receive the vested portion of Mr. Kocan's Supplemental retirement benefit under the terms of his Plan Agreement, provided that Mr. Kocan has adhered to, and will adhere in the future to, the limit on competitive activity as set forth in Paragraph 10 of his Plan Agreement. Mr.

Kocan's nine years of service as of his termination date entitles him to the supplemental retirement benefit according to the vesting schedule in Paragraph 5 of the Plan Agreement but he is not entitled to accelerated benefits. Accordingly, the *Kocan* Plaintiffs would thus be entitled to a supplemental retirement benefit in accordance with the terms of Paragraphs 5 and/or 7 of his Plan Agreement.

A Judgment will be filed simultaneously with this Memorandum of Decision and Order.