**John L. FRALEY, Jr. and Guyann Beam Fraley, Plaintiffs,**

v.

**ABF FREIGHT SYSTEM, INC., Arkansas Best Corporation, and WorldWay Corporation, Defendants.**

**No. 3:96CV539–P.**

United States District Court,
W.D. North Carolina,
Charlotte Division.

Jan. 15, 1999.

Katherine Thompson Kelly, Charlotte NC, Gary S. Hemric, Charlotte, NC, for plaintiff.

Debbie W. Harden, Charlotte NC, Brian Kaplan, New York City, Maury Josephson, New York City, for defendant.

### MEMORANDUM OF DECISION AND ORDER

POTTER, Senior District Judge.

#### FINDINGS OF FACT

A. *The Parties.*

1. Plaintiff John F. Fraley, Jr. ("Fraley") is a former corporate vice president for Carolina Freight Carriers Corporation ("CFCC") and Carolina Freight Corporation ("CFC"), and Plaintiff Guyann Beam Fraley is his wife. On April 24, 1986, Fraley entered into a contract entitled "Senior Executive Benefit Plan Agreement" ("SEBP"). See Defendants' Exhibit 8A.[1] Fraley entered into a restated contract entitled "Restated Senior Executive Benefit Plan Agreement" ("Agreement") on July 1, 1988. (DX 8b).

2. WorldWay Corporation ("World-Way") was the corporate parent of various companies prominent in the trucking/freight transportation business. WorldWay is the successor in name to CFC. CFC changed its name to Worldway in 1995. WorldWay merged with ABC Acquisition Corporation in the summer of 1997, with WorldWay as the surviving corporate entity. Cooper 11/5/98 Tr. pp. 212–213.

3. CFCC, an over-the-road less than truckload ("LTL") motor freight carrier (originally founded in the 1930's as Beam Trucking Co., a proprietorship) was the largest of WorldWay's subsidiaries and provided the bulk of WorldWay's revenues. CFCC was incorporated in 1937 and operated until 1982 when it became a subsidiary of CFC.

4. In 1995, CFC changed its name to WorldWay. (Huffstetler, Kocan 11/2/98 Trial Tr. pp. 104–105). WorldWay's operating subsidiaries also included: (a) Cardinal Freight Carriers (a truckload carrier based in North Carolina, with operations extending throughout the Eastern and Southeastern United States, and Canada); (b) Red Arrow Freight Lines (an LTL carrier based in Texas with operations extending throughout the Southwestern United States); (c) GI Trucking (an LTL carrier based in California with operations extending throughout the Western United States, Canada and Mexico); (d) Complete Logistics (which provided logistical support for truckload, Metropolitan LTL and Warehousing services); (e) Innovative Logistics (which provided transportation-related logistics services, such as intermodal shipping, rate negotiations and freight payment services, truckload and rail brokerage); and (f) Carotrans (an international shipping company).

B. *Plaintiffs' Employment With CFCC and WorldWay*

Fraley was hired by CFCC in July 1978, and became the Vice President of CFCC in 1985. Fraley became the Corporate Vice President for CFC in August 1993 and the Vice President of Customer Relations for CFCC in January 1995. Fraley 11/5/98 Tr. pp. 153–176. Fraley was terminated on October 13, 1995. DX 89.

C. *The Senior Executive Benefit Plan: Background*

CFCC first adopted the SEBP in or about 1980. Since its inception, the SEBP has functioned as a collection of Plan Agreements between CFCC and certain of its officers and senior executives chosen to participate in the SEBP. (Huffstetler 11/4/98 Tr. p. 13; PX 16). Beginning in 1982, with the adoption of the WorldWay

---

**1.** Defendants' Exhibits are hereafter designated by "DX" and Plaintiffs' Exhibits are here- after designated by "PX".

holding company structure (CFC), World-Way administered the SEBP for the holding company (CFC) and all subsidiaries.

### D. *The Fraley SEBP*

1. The SEBP Agreement between Fraley and CFCC provided Fraley or his beneficiary (Guyann Fraley), as applicable, with four categories of benefits:

(a) A salary continuation death benefit, meaning a twenty year stream of payments due in the event he dies while employed; (DX 8(b). ¶ 4)

(b) A supplemental retirement benefit with specific vesting requirements as set forth in the Plan Agreement (DX 8(b), ¶¶ 5, 7);

(c) A post-retirement death benefit (DX 8(b), ¶ 6); and

(d) Potential eligibility for "accelerated severance," consisting of the same twenty year payment stream as in (a), payable only in the event his employment was terminated following a change in control, and without the approval of the Incumbent Board (as defined in the Plan Agreement). (DX 8(b)). The history and purposes of the accelerated severance benefit—the principal benefit at issue in this action—is set forth in detail in Section E below.

2. The Plan Agreement also conditions the receipt of any of its benefits upon the participant's refraining from direct or indirect competition with WorldWay or any of its subsidiaries or affiliates, during the period when monthly payments are due thereunder. Paragraph 10 of Fraley's SEBP Agreement states in pertinent part:

> As conditions to the performance by the Company of its obligations under this Agreement, the Employee agrees that during his employment with Company, and for the further period during which monthly installments are payable hereunder, Employee will not, without the prior consent of the Board of Directors of the Company, directly or indirectly render any services to, become employed or otherwise participate or engage in the financing or conduct of any business which competes with any business conducted by Company in an area where such business is being conducted by Company ... Any provision of this Agreement to the contrary notwithstanding, no benefit whatsoever shall be payable under this Agreement if Employee fails to comply with the conditions of this paragraph 10.

### E. *History and Purposes of the Accelerated Severance Benefit*

1. Mechanically, under the terms of the Plan Agreement, accelerated severance, if due, would be provided in the same form as the stream of partial salary continuation payments that would be made pursuant to the Plan Agreement upon death while employed. (DX 8(b)).

2. The initial version of the Plan Agreements, used from 1980 to early 1988, has an accelerated severance provision different from the one at issue in this case. Those pre–1988 agreements provided:

> Nothing in this Agreement shall be construed to obligate the Company to continue to employ Employee; provided, however, that in the event such employment relationship is terminated within twenty (20) years of the date of this Agreement by Company or any successor corporation at any time after there has been a change in the working control of the Company or any successor corporation, and such termination occurs without the approval of the then living members of the Board of Directors of the Company as that Board was composed on (the date of the Agreement), Company or its successor corporation, as the case may be ...

is required to pay the accelerated severance benefit. Note that approval was required by "then living members of the Board of Directors". See DX 8(a).

Unlike Fraley's 1988 Plan Agreement, the pre–1988 Plan Agreement contained this restrictive language.

3. A number of developments led WorldWay's Board to seek review of the SEBP and a redrafting of the triggering mechanism for accelerated severance. Between 1986 and 1988, board members became aware of various hostile takeover activity in the trucking industry generally and rumors concerning WorldWay specifically. See Richardson, 11/5/98 Tr. pp. 42–43.

4. Against this background, the Board authorized an effort which came to be known as Project Early, the purpose of which was to place the Company in its best posture to deal with an unsolicited takeover attempt and maximize shareholder value. In conjunction with Project Early, WorldWay retained the services of the law firm Sullivan and Cromwell and the investment banks Morgan Stanley; and Donaldson, Lufkin, and Jenrette. See Richardson 11/5/98 Tr. pp. 44–53; Younger 11/6/98 Tr. pp. 8, 26–29; DX 21 at 2.

5. Recommendations made to the Board during this time included amending WorldWay's Articles of Incorporation to provide that directors could only be removed from the Board "for cause" and that such provision could only be amended or repealed by an 80% (or greater) shareholder vote, and evaluating and amending WorldWay's benefit plans, including the Senior Executive Benefit Plan, to contain "shark repellent" wherever possible. The Board directed Palmer Huffstetler, then WorldWay's general counsel, to take appropriate action to implement these recommendations. Richardson 11/5/98 Tr. pp. 42–48; Younger 11/6/98 Tr. p. 27.

6. Paragraph 9(b) of the 1988 SEBP Agreement states:

Nothing in this Agreement shall be construed to obligate the Company to continue to employ Employee; provided, however, that in the event such employment relationship is terminated by the Company or any successor corporation at any time after a change in control of the Company or any successor corporation, and such termination occurs without the written approval of a majority of the Incumbent Board as defined in paragraph 9(c)(2) *either before or after such termination occurs*, the Company ...

is required to pay the accelerated severance benefit. See DX 8B. (Emphasis added).

7. In contrast with the fixed group of individuals who would have had to approve an executive's termination following a change in control under the pre–1988 Plan Agreement, the Plan Agreements at issue here contain an evolving Incumbent Board mechanism under which individuals who were elected as members of the WorldWay Board would, by definition, become members of the Incumbent Board if their elections were approved by three-quarters of their predecessors. See DX 8A, 8B.

8. The "Incumbent Board" definition under paragraph 9(c)(2) is "individuals who constitute the Board on the date hereof (1) ..." Paragraph 9(c)(2) then continues with the proviso:

... provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least three quarters of the directors comprising the Incumbent Board (either by specific vote or by approval of the proxy statement of the Company in which such person is named as a nominee for director, without objection to such nomination) shall be, for purposes of this clause (c), considered as though such person were a member of the Incumbent Board.

DX 8B, ¶ 9(c)(2).

9. In contrast with the Senior Executive Benefit Plan Agreement of Fraley, which left an award of severance benefits following a change in control to the discretion of the Incumbent Board, the 2.99 Severance Pay Plans were prepared by Sulli-

van and Cromwell and updated by the Board in 1987–88 for the management of WorldWay. The 2.99 Severance Pay Plans left no discretion to the Incumbent Board. Under these 2.99 Severance Pay Plans, which were approved only for a select few in the highest echelon of management, severance would automatically be paid to the individual upon termination within a specific period after a change in control. The only exception to payment of severance with the 2.99 Severance Pay Plans is if the employee's termination was for cause or because of death, retirement or disability.

10. These 2.99 Severance Pay Plans provided:

> If any of the events described in Section 3 hereof constituting a change in control of the Company shall have occurred, you shall be entitled to [specified severance benefits] upon the termination of your employment within twenty-four (24) months after such event, unless such termination is (a) because of your death or Retirement; (b) by the Company for Cause or Disability; or (c) by you other than for Good Reason.... (DX 10 at 3). (This is from the SEBP for Lary Scott and is substantially similar to the Plan adopted by the Board in 1987/88. Huffstetler 11/5/98 Tr. pp. 15–16).

11. Even though Huffstetler testified that he had lifted the language from the 2.99 Severance Pay Plans in revising the SEBP (Huffstetler 11/2/98 Tr.; Kocan Trial Tr. pp. 127–128) it should be noted that the 2.99 Severance Pay Plans require only two events to trigger the accelerated benefits; i.e., (1) change of control, and (2) termination of the employee by the Company. However, the SEBP requires three events: (1) change in control, (2) termination of the employee by the Company, and (3) lack of approval by the Incumbent Board (DX 8(b), ¶¶ 9(b), 9(c)(2)). The different language lends credence to the argument that the approval by the Incumbent Board was intentional in order to prevent a hostile takeover of the Company.

12. Additional evidence of the Board's intention not to trigger accelerated severance to Fraley can be found in the WorldWay Director Fee Continuation Plan. Like the SEBP, the Director Fee Continuation Plan took the form of individual agreements ("Fee Continuation Agreements") between WorldWay and each member of its Board of Directors, and provided generally for supplemental retirement benefits in the event a Director served for a certain number of years and a death benefit in the form of fee continuation for 15 years in the event a Director were to die in service. (See DX 9).

13. Parallel with the redrafting of the Plan Agreements in 1988, the Board authorized Mr. Huffstetler to redraft the Fee Continuation Agreement to contain the same language as was added to Paragraph 9 of the SEBP Agreement, including the identical definition of the term "Incumbent Board." See Huffstetler 11/2/98 Tr. pp. 165–169; Kocan Trial.

14. Thus, Paragraph 6 of the Fee Continuation Agreement states:

> In the event the term of service of the Director is terminated by the Company or any successor corporation at any time after a change in control of the Company or any successor corporation, and such termination occurs without the written approval of a majority of the Incumbent Board, as defined herein, either before or after such termination occurs, the Company ...

shall pay an accelerated change in control payment.

15. Paragraph 6 of the Fee Continuation Agreement defines the Incumbent Board as:

> ... individuals who constitute the Board on the date hereof (the "Incumbent Board") ... provided that any person becoming a director subsequent to the date hereof whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least three quarters of the directors

comprising the Incumbent Board (either by a specific vote or by approval of the proxy statement of the Company in which such person is named as nominee for director, without objection to such nomination) shall be, for purposes of this paragraph considered as though such person were a member of the Incumbent Board. (See DX 40).

16. Following the transaction with Arkansas Best, the departing Pre–Merger WorldWay Directors did not receive any change in control payments pursuant to the language quoted above. Rather, each Director who was vested in the retirement portion of his Fee Continuation Agreement as of August 1995 became entitled to receive only such vested retirement benefits. Richardson 11/5/98 Tr. p. 59; Cooper 11/4/98 Tr. p. 6, Kocan Trial.

F. *WorldWay's Decline and the Arkansas Best Transaction.*

1. CFCC generally prospered from the time of its founding until the early 1990's. CFCC's prosperity largely coincided with a period of intense federal regulation of the trucking industry, under the jurisdiction of the Interstate Commerce Commission ("ICC"). In 1991 CFCC began losing millions of dollars when deregulation began. Richardson 11/5/98 Tr. pp. 51–52; Younger 11/6/98 Tr. pp. 5–7.

2. Passage of amendments to the Motor Carrier Act in 1980, however, ushered in a period of deregulation and increasingly intense competition in trucking, and particularly harsh impact on relatively smaller LTL carriers like CFCC. Since CFCC provided the bulk of WorldWay's revenues, WorldWay's fortunes soured in the early 1990's and never recovered. Richardson 11/5/98 Tr. pp. 51–52.

3. WorldWay's Board of Directors began aggressive steps to address the decline of WorldWay's business in 1993 by, among other things, hiring Lary R. Scott as WorldWay's Chief Executive Officer. Mr. Scott formerly had been the Chairman of Consolidated Freightways, Inc., holding company for one of the country's largest over-the-road air and intermodal shipping networks. Scott 11/5/98 Tr. pp. 105–107; Younger 11/6/98 Tr. pp. 14–15.

4. The WorldWay Board provided Mr. Scott with two explicit charges, to be pursued simultaneously; (i) to bring about a turnaround of WorldWay's business; and (ii) to seek out a friendly buyer or other strategic combination between WorldWay and another trucking firm. Younger 11/6/98 Tr. p. 15; Scott 11/5/98 Tr. p. 108.

5. In April 1994 the International Brotherhood of Teamsters commenced a nationwide strike against the LTL industry. WorldWay's LTL subsidiaries (CFC and Red Arrow), financially unable to weather the strike, sought and obtained rare exemption from the Teamsters. Scott 11/5/98 Tr. p. 114.

6. Despite being able to operate through the strike, WorldWay's LTL subsidiaries lost approximately $4.8 million in 1994. WorldWay's LTL subsidiaries had also lost $7.5 million in 1993. Had CFCC been struck, it would have "been the end of CFCC as we know it." Scott 11/5/98 Tr. p. 116; Richardson 11/5/98 Tr. p. 51; DX 4 at 4.

7. In connection with the charge to find a friendly buyer, WorldWay began discussing a potential merger with Arkansas Best early in 1994. After a hiatus due in part to the Teamsters' strike described above, the discussions resumed in 1995. Richardson 11/5/98 Tr. pp. 53–54; DX 4 at 4.

8. By the time the discussions resumed in 1995, WorldWay stood on the precipice of bankruptcy and liquidation. For the second quarter of 1995, WorldWay had stated pre-tax losses of $18 million, projected at $11.4 million after taxes. Additional losses of $1.1 to $1.3 million per week were projected for the remainder of 1995, as well as cash losses of $500,000 to $700,000. WorldWay's credit facility with Citibank stood within weeks of expiration and would not be renewed and alternative

credit was available only on considerably less favorable terms. DX 1 at 2–3; Richardson 11/5/98 Tr. pp. 52–53.

9. The resumed discussions between WorldWay and Arkansas Best ultimately produced an agreement for Arkansas Best's purchase of WorldWay for $11.00 per share. Richardson 11/5/98 Tr. p. 54; DX 1. Despite WorldWay's dire financial condition, this price represented a premium of nearly 16% over WorldWay's per share trading price of $9.50 at the time. DX 1 at 6. The WorldWay Board was pleased with the offer. Richardson 11/5/98 Tr. pp. 54–55; Younger 11/6/98 Tr. pp. 17–18; DX 1.

10. Prior to voting, the WorldWay Board reviewed a variety of subjects at their July 8, 1995 meeting, including WorldWay's deteriorating finances and the lack of interest in an acquisition by potential acquirers other than Arkansas Best. Liquidation analyses were presented at the meeting by both WorldWay's chief financial officer and outside investment bankers. DX 1. WorldWay's project share price in liquidation, from a low of $3.40 to a most likely scenario of approximately $8.00, was far inferior to Arkansas Best's $11.00 cash offer. Richardson 11/5/98 Tr. at 52–55; DX 1.

11. The members of the WorldWay Board of Directors on that date (July 8, 1995) were: Lary Scott, Paul Richardson, K.G. Younger, William Mapel, Governor James Martin, Charles Grace, J.M. Carstarphen, and Daniel Boggan, Jr. (the "pre-merger directors") DX 1. There is no dispute that these directors constituted the Incumbent Board as defined in Paragraph 9(c)(2) of the SEBP. Plaintiff's counsel Gary S. Hemric, Esq., Opening Statement 11/4/98 Tr. p. 7.

12. Pursuant to an Agreement and Plan Merger (the "Merger Agreement"), unanimously approved by the WorldWay Board at a meeting on July 8, 1995, Arkansas Best commenced a tender offer for WorldWay's common stock on July 14, 1995.[2] DX 2 at 5. The tender offer was well received, and closed on August 11, 1995, with 91% of WorldWay's shares (approximately 5.9 million to 6.5 million), having been tendered to Arkansas Best for payment. Immediately after the close of the tender, Arkansas Best began the process of integrating its and its operating subsidiaries' business with those of WorldWay (including CFCC). Yorke 11/3/98 Tr. pp. 89–90, Kocan Trial; Cooper 11/3/98 Tr. pp. 117, 122, Kocan Trial; DX 6.

G. *The Corporate Processes of Arkansas Best's Acquisition of WorldWay Relevant to Plaintiff's Plan Agreements.*

1. At the July 8, 1995 meeting, the Pre–Merger Directors reviewed and then voted unanimously to approve the Merger Agreement, to recommended that WorldWay's shareholders accept Arkansas Best's $11.00 per share tender offer and to authorize Scott and Yorke (WorldWay's General Counsel) to take steps "necessary or appropriate" to carry out the terms of the Merger Agreement and the transactions contemplated thereby. DX 1.

2. Article I, Section 1.5(a) of the Merger Agreement (DX 3) specifically addressed the evolution of WorldWay's Board upon consummation of the Arkansas Best tender offer, assuming a tender of greater than 50%: Arkansas Best would designate a number of directors for election to the WorldWay Board proportionate to its holding of WorldWay common stock (the "Arkansas Best Designees"), and a sufficient number of Pre–Merger Directors would resign to make way for the Arkansas Best Designees' election. Article I, Sections 1.5(a) and (b) was as follows:

Section 1.5 Directors.

2. The corporate entity formed for the purpose of carrying out the tender offer was ABC Acquisition Corporation ("ABC Acquisition"), a North Carolina corporation and wholly- owned subsidiary of Arkansas Best. For ease of reference, ABC Acquisition will also be referred to as Arkansas Best.

(a) Promptly upon the acceptance for payment of any shares of Company Common Stock by Sub (ABC Acquisition Corp.) pursuant to the Offer, Sub shall be entitled to designate such number of directors, rounded up to the next whole number, on the Board of Directors of the Company as will give Sub, subject to compliance with Section 14(f) of the Exchange Act, representation on the Board of Directors equal to at least that number of directors that equals the product of the total number of directors on such Board (giving effect to the directors elected pursuant to this sentence) multiplied by the percentage that the aggregate number of shares of Company Common Stock held by Sub, including shares of Company Common Stock then outstanding, and the Company and its Board of Directors shall, at such time, take any and all such action *needed to cause Sub's designees to be appointed to the company's board of directors (including to cause directors to resign).* (b) The Company's obligations to appoint designees to the Board shall be subject to Section 14(f) of the Exchange Act and Rule 14–f promulgated thereunder. The Company shall promptly take all actions required pursuant to Section 14(f) and Rule 14f–1 in order to fulfill its obligations under this Section 1.5 and shall include in the Schedule 14D–9 mailed to shareholders after the commencement of the Offer such information with respect to the Company and its officers and directors as is required under Section 14(f) and Rule 14f–1 to fulfill its obligations under this Section 1.5. DX 3. (Emphasis added).

3. The Pre–Merger Directors were informed who their potential replacements would be and the process by which they would be elected to the WorldWay Board following the close of the tender offer. Richardson 11/5/98 Tr. p. 57.

4. On July 14, 1995, the WorldWay Board of Directors mailed to shareholders the following items: (a) WorldWay's Solicitation/Recommendation Statement on Schedule 14D–9; (b) Arkansas Best's Offer to Purchase; and (c) a cover letter to shareholders from Mr. Scott (on behalf of the Board of Directors). DX 4.

5. Those documents informed WorldWay's shareholders of the process by which the Arkansas Best Designees would be elected to the WorldWay Board, the identities of, and biographical information concerning the ten candidates for election to the WorldWay Board. (See Schedule 1, DX 5 at 38).

6. By unanimously approving the Merger Agreement and the transactions contemplated thereby, and unanimously directing Messrs. Scott and Yorke to take such action as "necessary or appropriate" to carry out those transactions, the Pre–Merger Directors unanimously approved the election of the Arkansas Best Designees to the WorldWay Board by specific vote on July 8, 1995. See DX 1 and attachments; DX 2; Richardson 11/5/98 Tr. pp. 57–60; Younger 11/6/98 Tr. p. 19.

7. Arkansas Best's tender offer closed at midnight on August 10, 1995, with approximately 91% of shares having been tendered. DX 6.

8. Pursuant to Section 1.5(a) of the Merger Agreement, Arkansas Best became, based on the 91% tender, entitled to designate for election the holders of seven of eight seats on WorldWay's Board. Arkansas Best designated Messrs. Young, Neal, Cooper, Meyers, Slack, Marquardt, and Morris. DX 6.

9. Messrs. Boggan, Carstarphen, Grace, Mapel, Martin, Richardson, and Younger resigned from the Board effective August 11, 1995 to make way for the Arkansas Best Designees' election. Upon these resignations. Lary Scott became the sole director of WorldWay remaining in office. Younger 11/6/98 Tr. p. 19; DX 6 and attachments.

10. In furtherance of the Merger Agreement, on August 11, 1995, Messrs.

Young, Neal, Cooper, Meyers, Slack, Marquardt and Morris were elected to fill the vacancies created by the voluntary resignations of Messrs. Boggan, Carstarphen, Grace, Mapel, Martin, Richardson, and Younger. Such election was approved by a unanimous vote of the Incumbent Board as it existed in July (i.e., the Pre–Merger Directors) and was carried out by Mr. Scott, acting pursuant to his prior directive from the WorldWay Board to implement the Merger Agreement and as the sole remaining director remaining in office. See DX 6.

11. Article III, Section 5 of World-Way's By–Laws provide, in relevant part:

Any vacancy occurring in the Board of Directors . . . may be filled by the Board of Directors. If the directors remaining in office do not constitute a quorum, the directors may fill the vacancy by the affirmative vote of a majority of all the directors, or by the sole remaining director, remaining in office____ A director elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office. (Emphasis added) (See DX 18).

12. This Board thus became the Incumbent Board under Paragraph 9(c)(2) of the Plan Agreement and the By–Laws of WorldWay.

13. The WorldWay Board consisting of Messrs. Scott, Young, Neal, Copper, Meyers, Slack, Marquardt, and Morris, operating as the Incumbent Board, executed a resolution on October 17, 1995 approving the terminations of Mr. Fraley (and other senior executives) for purposes of the SEBP. (See DX 7, Attachment A).

14. Those officers having 2.99 Severance Pay Plans as described above change in control severance benefits under their agreements, received such benefits because their agreements did not make payment of severance contingent upon non-approval of the termination of their employment by the Incumbent Board. Cooper 11/5/98 Tr. pp. 240–242.

## CONCLUSIONS OF LAW

1. ERISA plans are interpreted with reference to the federal common law of contracts. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). The first touchstone of such interpretation is the written plan's express terms. As the Fourth Circuit Court of Appeals has observed, "[t]he award of benefits under any ERISA plan is governed in the first instance by the language of the plan itself." *Hickey v. Digital Equip. Corp.,* 43 F.3d 941, 947 (4th Cir.1995) (quoting *Lockhart v. United Mine Workers 1974 Pension Trust,* 5 F.3d 74, 78 (4th Cir.1993)). Language in contract is ambiguous when it is reasonably capable of being understood in more than one sense. Test for determining whether a contract is ambiguous is whether reasonable persons would find the contract subject to more than one interpretation. Black's Law Dictionary. 6th Ed.1990 (citations omitted).

The Court finds that the language in the SEBP is not ambiguous. It means what it says, and says what it means.

2. Where, as here, the plan language at issue is unambiguous on its face, it controls, and the Court need not examine evidence extrinsic to the plan. *See Baker v. BASF Corp.,* 83 F.3d 414, No. 95–1353, 1996 WL 192076 at *2 (4th Cir. Apr.22, 1996); *Denzler v. Questech, Inc.,* 80 F.3d 97, 101, 103 (4th Cir.1996); *Goodman v. Resolution Trust Corp.,* 7 F.3d 1123, 1126 (4th Cir.1993). If the Court believes that any of the relevant provisions of the plan are ambiguous, it may look to extrinsic evidence as an aid to interpretation. *See Fuller v. FMC Corp.,* 4 F.3d 255, 259 (4th Cir.1993), *cert. denied,* 510 U.S. 1115, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994).

3. The circumstances under which Plaintiff may be eligible for the accelerated severance benefit are set forth in Paragraphs 9(b) and 9(c) of his Plan Agreement.

4. Paragraph 9(b) sets forth three conditions that each senior executive must satisfy in order to be eligible for accelerated severance: (a) there must be a change in control of WorldWay; (b) his employment must be terminated by the Company (or any successor corporation) after the change in control; and (c) his termination must be without the written approval of WorldWay's Incumbent Board, as defined in Paragraph 9(c)(2) of the Plan Agreement, either before or after such termination occurs.

5. Defendants acknowledge that a change in control of WorldWay had occurred by August 10, 1995 when 91% of the outstanding common stock shares of WorldWay had been tendered to Arkansas Best by WorldWay's shareholders. Similarly, the record shows that John L. Fraley was involuntarily terminated.

6. On October 17, 1995, WorldWay's Board of Directors consisted of Lary Scott, Richard Cooper, William Marquardt, John Meyers, John Morris, Donald Neal, R. David Slack, and Robert Young, III. These individuals constituted the Incumbent Board under Paragraph 9(c)(2) of the Plan Agreement and unanimously approved the termination of the Plaintiff. DX 15.

7. The Court concludes that Plaintiff is not eligible for accelerated severance benefits because Mr. Fraley's termination was approved unanimously by the Incumbent Board, as defined in the SEBP. However, he remains eligible for supplemental retirement benefits under the terms of his SEBP. Further, the Court admonishes the Plaintiff, Mr. Fraley, to abide by the noncompete provisions of Paragraph 10 of the SEBP dated July 1, 1998 between CFCC and John L. Fraley. DX 8b.

8. As the Court has determined that Plaintiff is not entitled to receive *accelerated* benefits under the SEBP because his termination was approved unanimously by the Incumbent Board as provided for in Paragraph 9(c)(2) of the Agreement, the Court does not reach the Defendants' argument that Plaintiff constructively resigned his employment with Defendants.

9. Finally, the Court does not agree with the disingenuous argument by Plaintiff. The substance of Plaintiff's contention is set out on pages 10, 11, and 12 of his post-trial brief, wherein *he states among other contentions:*

No evidence was presented at trial that the members who approved John's termination on October 17, 1995 were in fact members of the "Incumbent Board" by way of the normal evolution set forth in the definition of Incumbent Board in the SEBP. Instead, the evidence was that, never before had the directors come onto the board as the Arkansas Best Designees did as a result of the merger agreement. Upon until 1995, the directors were elected to the board by way of the normal evolution of the board. (See Plaintiff's Exhibit 37, T. Vol. 1, p. 66). There was evidence to the effect that seven of the eight members of the Incumbent Board resigned on July 8, 1995 and put their resignations in escrow and that ultimately the resignations were accepted and Lary Scott voted in a new Board of Directors of WorldWay Corporation. This procedure is not in keeping with that envisioned by the specific definition of Incumbent Board as clearly provided in the language of the SEBP in that the members of the Incumbent Board prior to the mass resignation (the "pre-merger board") never specifically voted on the new board members (the Arkansas Best Designees), but instead, resigned. See Plaintiff's Exhibit # 15. Nor were the new board members voted on by shareholders at the annual meeting. Only Lary Scott voted on the new board (the Arkansas Best Designees), and being only one person, he could not constitute at least three-quarters of the directors of the board.

Defendants argue that a Seventh Circuit decision in *In re Forum Group*, 82 F.3d 159 (7th Cir.1996) is instructive in

this case with regard to interpreting the language of the SEBP. The *Forum* case is clearly distinguishable from the case at hand for the following reasons. First, it is a bankruptcy case from the Seventh Circuit whose precedence is not controlling here in the Fourth Circuit. More importantly, it is not analogous as Defendants argue because the plan in the *Forum* case required *only recommendation* of the new directors by the old directors. Here, the SEBP provides explicitly that the election of the new Incumbent Board members must be "approved by a vote of at least three quarters of the directors comprising the Incumbent Board (either by a *specific vote or by approval of the proxy statement of the company in which such person is named as nominee for director, without objection to such nomination*)." When construing the meaning of the requirement of a "specific vote" by three quarters of the board, the court must give meaning of the "specific vote" provision requirement. Defendants ignore the specific vote requirement in their argument relation to the *Forum* case.

However, Defendants have argued in other instances that there was a "specific vote"; Defendants cite to a *non* specific vote of the pre-merger board when they approved the Plan of Merger that does not even list any new directors. Defendants' interpretation of the "specific vote" requirement renders the provision nugatory, because there is *no* "*specific vote" by three-quarters of the pre-merger board for the Arkansas Best Designees* (the pre-merger directors never *specifically voted* on the Arkansas Best Designees!). Furthermore, the Board of Directors in July of 1995 (the pre-merger board) never approved a proxy statement naming the Arkansas Best Designees as nominees for director and Defendants do not contend they did. Instead, Defendants argue that it was a "specific vote." The vote was not a "specific vote" by three-quarters of the

pre-merger directors because they only approved a merger agreement providing that the "*Sub [ABC Acquisition Corporation] shall be entitled to designate such number of directors.*" The Merger Agreement does not name any directors.

Even if the Arkansas Best Designees had been "approved" by three-quarters of the board of directors by specific vote as required under the Incumbent Board definition, pursuant to the Merger Agreement, those directors would have ceased to be directors on October 12, 1995, the effective time under the Merger Agreement. Accordingly, the *Forum* case is clearly distinguishable from the case at bar.

Plaintiff's Post–Trial at 10–12 (citations omitted) (emphasis in original).

As to Plaintiff's contention that no evidence was presented at trial that the members who approved Plaintiff's termination on October 17, 1995 were in fact members of the Incumbent Board see DX 6 and DX 7.

DX 6 includes the resignation of the WorldWay Board which existed on July 8, 1995, the resignations being effective August 11, 1995.

DX 7 is the unanimous consent of the Board of WorldWay which had been designated by ABC Acquisition Corp. and unanimously approved by the WorldWay Board as it existed on July 8, 1995, and the unanimous consent to the termination of the Plaintiff, among others, from the employment by WorldWay.

As to the contention that never before the merger with ABC Acquisition Corp. had directors come into the board in this manner, there is nothing in the SEBP, the merger documents, or the By–laws of WorldWay which would preclude a director from being elected in connection with a merger agreement, nor which state that a director be elected to the board "by way of normal evolution of the Board." Whether there had ever been directors

come on the Board as the result of a merger agreement is of no moment.

The Arkansas Best Designees were approved by the WorldWay Pre–Merger Board, by Arkansas Best Acquisition Corp., and by the sole director on the WorldWay Board of Directors on August 11, 1995, Lary Scott. (See DX 6).

The Plaintiff's objection that the members of the Incumbent Board never specifically voted on the new board members is also contrary to the evidence. The members of the Incumbent Board prior to their resignations did in fact specifically vote unanimously on the Arkansas Best Designees at their July 8, 1995 meeting. (See DX 1 and DX 2 at 2). The Pre–Merger Directors unanimously approved the Merger Agreement and authorized WorldWay's general counsel (Yorke) and chief executive officer (Scott) to take all steps necessary or appropriate to carry out the terms of the Merger and the transactions contemplated thereby. DX 6; Richardson 11/5/98 Tr. p. 60; Younger 11/6/8 Tr. p. 19.

The resignation of the Pre–Merger Directors was tendered on July 8, 1995 and effective on August 11, 1995. Young 11/6/98 Tr. p. 19. At the meeting on August 11, 1995, the sole director, Lary Scott, adopted the following resolution:

Now, therefore, be it resolved, that, pursuant to Section 1.5 of the Merger Agreement and pursuant to Article III, Section 5, of the Bylaws of the Corporation, the following individuals are hereby elected and appointed to serve as the directors of the Corporation until the next annual meeting of shareholders of the Corporation or the earlier death, removal, or resignation of any such individual, or until their successors have been duly elected: Robert A. Young, III, Donald L. Neal, Richard F. Cooper, John R. Meyers, R. David Slack, William A. Marquardt, and John H. Morris.

This action is effective this 11th day of August, 1995.

In summary, and in response to Plaintiff's contention that no evidence has been presented at trial that the members "who approved John's termination on October 17, 1995 were in fact members of the Incumbent Board by way of normal evolution," the sequence of events by which the Board on October 17, 1995 became members of the Incumbent Board and were in fact members on October 17, 1995 is as follows:

In a meeting on July 8, 1995 the WorldWay Board of Directors, all of whom had been elected and were members of the Board of Directors of WorldWay since at least February 1, 1995, approved the Agreement and Plan of Merger. DX 3. Two of the Directors (Richardson an Younger) had been on the Board since July 1, 1988. DX 16.

At the same meeting, the Board of Directors approved the merger and authorized WorldWay's general counsel (Yorke) and chief executive officer (Scott) to take all steps "necessary or appropriate" to carry out the terms of the Merger Agreement and the transactions contemplated thereby. (See Richardson 11/5/98 Tr. pp. 60–61); (Younger 11/6/98 Tr. p. 19; DX 2.) The Merger Agreement was approved by WorldWay, Arkansas Best Corporation, and ABC Acquisition Corporation, (DX 3). Section 2.6 read:

Section 2.6 Directors. The directors of Sub immediately prior to the Effective Time shall become the directors of the Surviving Corporation, until the earlier of their resignation or removal or until their respective successors are duly elected and qualified, as the case may be. (DX 2 at 4).

By letter dated July 14, 1995, WorldWay's Chairman of the Board mailed to WorldWay's shareholders: (1) a cover letter on behalf of the Board (DX 4); (2) WorldWay's Solicitation/Recommendation Statement on SEC Schedule 14D–9 (DX 4); and (3) Arkansas Best's Officer Purchase (DX 5), informing WorldWay's shareholders of the process by which the

Arkansas Best Designees would be elected to the WorldWay Board, and included biographical information concerning the ten candidates for election to the WorldWay Board prior to tendering their shares. (DX 4 2, 9, I–1, I–2; DX 5 at 38–39).

The "Offer to Purchase" and Schedule I of "WorldWay's Solicitation/Recommendation Statement" also advised WorldWay's shareholders that the election of the designees will be accomplished at a meeting or by written consent of the Board (DX 4 at 1–2).

The tender offer was well received and closed on August 10, 1995 at midnight. Pursuant to Section 1.5(a) of the Merger Agreement and the 91% tender of shares, Arkansas Best (the "sub" under the Merger Agreement) became entitled to designate seven of the eight seats on WorldWay's Board (DX 3, Sec. 1.5(a)). Arkansas Best designated the persons named in DX 6.

The written consent of the sole remaining director, Scott, pursuant to Section 1.5 of the Merger Agreement, as well as Article III, Section 5 of the By–Laws of the Corporation, and the resignation of the Pre–Merger Directors (other than Scott), which were effective August 11, 1995, were forwarded to Mr. Cooper, general counsel for Arkansas Best (Cooper 11/5/98 Tr. pp. 227–228; DX 6). The election of the Board of Directors from the Arkansas Best Designees had been approved by the unanimous vote of the Incumbent Board on July 8, 1995, and by 91% of the shareholders who had tendered their shares to Arkansas Best (Richardson 11/5/98 Tr. pp. 60–61; DX 6).

Thus, seven of the ten Arkansas Best Designees were unanimously approved by the Directors of WorldWay by unanimous vote of the Pre–Merger Directors on July 8, 1995, and became members of the Incumbent Board under Paragraph 9(c)(2) of the SEBP as of August 11, 1995 (DX 6) by the vote of the sole remaining director.

As to Plaintiff's contention that "even if Arkansas Best Designees have been approved by three-quarters of the Board of Directors by specific vote, those directors would have ceased to be directors on October 12, 1995, the effective time of the Merger Agreement," the evidence is contrary to Plaintiff's contention. Arkansas Best's General Counsel testified that Arkansas Best had to await regulatory, labor, union and other approval. Cooper 11/5/98 Tr. pp. 211–215, 244; DX 72 at ii–iii. 5. Supporting Defendants' contention that the Arkansas Best Designees who had been elected to the Board of WorldWay continued as directors beyond October 12, 1995 is the following evidence: Testimony of Cooper, 11/5/98 Tr. pp. 212–215, 228, 232–233, 248–250; DX 72; DX 7; DX 13; DX 14; and DX 15. Mr. Cooper's testimony as to the Board of Directors of World-Way continuing in office after 10/12/95 is as follows:

Q. Effective date of the merger is October 12, 11:59:59?

A. If that's what it says on the plana that you have looked at, that's fine, yes.

Q. And at that time, Mr. Cooper, the WorldWay Corporation was merged into ABC Acquisition Corporation, correct?

A. No.

Q. That's not correct?

A. No.

Q. Was it the other way around, was ABC Acquisition Corporation merged into WorldWay Corporation?

A. That's correct. WorldWay was survivor.

Q. So WorldWay was the surviving corporation?

A. Yes, it was.

Q. Is it not correct, Mr. Cooper that effective with the stroke of midnight on October 12th, you, Mr. Rick Cooper, were the sole remaining director of WorldWay Corporation?

A.a I don't believe that's really true. I know the document says that the plan of merger says that the sole directors of

Acquisition will become the directors of WorldWay, but there are a couple of things I think that are important to keep in mind. One is that the plan of merger is signed by each of WorldWay and ABC Acquisition, and immediately with the signing, the WorldWay—this board that you see, Scott, Young, Marquardt, Morris, et cetera, continued to operate as the board of WorldWay without really a break in any chain. You had the 100 percent shareholders in each instance ratifying what, in fact, was happening.

So I feel very comfortable that the whole time, Scott, Young, Marquardt, Morris, et cetera, continued on as directors of the merged corporation, WorldWay, which they were directors of before the merger, and continued, and that's of course, what you see in the various documents that occurred almost immediately thereafter.

Q. Okay. So, again, you understand my contention. Am I correct that there is, when you read the plan of merger documents that were prepared in this transaction, and they are about that thick, aren't they (indicating), you can read it in a way that says Rick Cooper as the director, sole director of ABC Acquisition Corporation before the effective date is after the effective date of the merger the sole remaining director of WorldWay Corporation, is that a correct statement?

A. The document says that, but, in fact, what happened was WorldWay continued, it was the survivor, its directors continued. You had both shareholders, 100 percent shareholders, I signed for both corporations, I represented and held both proxies, and they continued on. The document literally says that but the actual happening continued on the WorldWay directors.

Q. Articles of merger say that, too, doesn't it?

A. That's what I said, yes. But you go back part of that was because, you go back to July 8th, the merger agreement, that was approved, and I think it's article 2 or section 2, whatever the proper designation, it talks about and contemplates this October 12th merger. The problem was that on July 8th, we didn't know how long it was going to take to get through the ICC, and we didn't know how long it was going to take to get the union approval to merging the two work forces. So we had to structure some things that we had to follow up. Once we got the approval of the unions and the ICC, then we were able to go ahead and send out the notice to shareholders and go ahead and conduct the merger. By that time, we had the new incumbent board of WorldWay and they continued on.

Cooper 11/5/98 Tr. p. 212, lines 12–25; pp. 213–214; p. 215, lines 1–9.

The Plaintiffs will be eligible to receive the vested portion of John Fraley's supplemental retirement benefit under the terms of his SEBP, provided that he has adhered to and will adhere in the future to the limit on competitive activity as set forth in Paragraph 10 of his SEBP. Accordingly, the Court finds that the Plaintiffs are not entitled to accelerated severance benefits because Mr. Fraley's termination was approved by the Incumbent Board.

Plaintiffs are eligible for a supplemental retirement benefit under the terms of the Plan Agreement.

The remaining claims for relief in the Plaintiffs' Complaint are dismissed.

Finally, the Plaintiffs are not entitled to any attorneys' fees in this action.

A Judgment will be filed simultaneously with this Memorandum of Decision and Order.